In re William G. WALTERS, Terry G. Walters, Debtors.

UNITED STATES of America, Plaintiff,

v.

William G. WALTERS, Terry G. Walters, Defendants.

William H. WALTERS, Plaintiff,

v.

William G. WALTERS, Defendant.

Bankruptcy No. 89–62082.
Adv. Nos. 91–6073, 90–6030.

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division.

June 27, 1994.

---

See also, 166 B.R. 119.

838

Peter Sklarew, U.S. Justice Dept., Washington, DC, for plaintiff.

William G. Walters, pro se.

James R. Byron, Elkhart, IN, for plaintiff William H. Walters.

*CONSOLIDATED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER, AS TO § 505 TAX MOTION FILED BY UNITED STATES OF AMERICA IN MAIN CASE NO. 89–62082, AND JUDGMENTS AS TO COUNT I OF ADVERSARY PROCEEDING NO. 91–6073 AS SUPPLEMENTED, AND ADVERSARY PROCEEDING NO. 90–6030.*[1]

KENT LINDQUIST, Chief Judge.

## I

### Statement of Proceedings

1. William Grant Walters ("Debtor William") and Terry Geralyn Walters ("Debtor Terry") (or collectively "the Walters" or "the Debtors") are the Debtors in their Joint Chapter 7 Case No. 89–62082, and the Co-Defendants in Adversary Proceeding No. 91–6073. The Debtor William is the sole Defendant in Adversary Proceeding No. 90–6030.

2. The Debtors filed their Bankruptcy Petition on December 4, 1989, and were granted a Chapter 7 discharge on May 10, 1990.

3. On December 27, 1989, the Joint Proof of Claim of United States and William H. Walters ("Dr. Walters") was filed (Claim S–1), based upon Settlement Agreement and a Judgment in *United States and William H. Walters v. William G. Walters and Terry G. Walters,* Cause No. S86–458, in the District Court for this District. The Judgment is for $120,000, plus interest against the Debtor William only, but secured, pursuant to the Settlement Agreement signed by both Debtors (which was recorded with the LaPorte County Recorder), by the Debtors' former residence at 104 Valentine Court in Michigan City, Indiana ["the 104 Valentine property"].

4. Adversary Proceeding No. 90–6030 was commenced by Dr. Walters against the Debtor William by Complaint filed on March 5, 1990, seeking to establish an entirely different liquidated claim and an exception to its discharge, pursuant to 11 U.S.C. § 523(c). The non-dischargeable damages prayed for in Dr. Walter's Complaint has since been limited, through a pre-trial order, to $300,000.

5. Adversary Proceeding No. 91–6073 was filed by the United States of America ("United States") as authorized by a delegate of the Secretary of the Treasury and directed by the Attorney General of the United States pursuant to 26 U.S.C. §§ 7401 and 7403 on May 10, 1991. The Complaint was originally in three counts: (I) to revoke the debtors' discharge based on an allegation of fraudulent concealment of assets and false statements on their statement of financial affairs, (II) to hold the Debtor Terry liable for damage to the 104 Valentine Court property in alleged breach of the District Court settlement agreement; and (III) alleging that the Debtor William deliberately vandalized the 104 Valentine Court property in violation of the automatic stay.

6. At the trial in these proceedings on February 2–3, 1994, in light of the Debtors' failure to appear thereat, the United States was granted leave to withdraw Counts II and III without prejudice in order to enable full presentation of the case without the need to call witnesses who had not yet been subpoenaed due to the Court's having set a bifurcated trial schedule, with only certain witnesses to be called at the first session. The Court granted said Motion.

7. The United States moved to supplement Count I to include allegations of misconduct by the debtors subsequent to the filing of the complaint, pursuant to Fed. R.Civ.P. 15(b) and (d) and as suggested in this Court's MEMORANDUM OPINION AND ORDER ON MOTION To Dismiss, entered in Adversary Proceeding No. 93–6137, on January 11, 1994.

---

1. This constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52 as made applicable by Fed.R.Bk.P. Rule 9014 and Fed.R.Bk.P. 7052.

8. The two Adversary Proceedings, No. 91–6073 and No. 90–6030 were consolidated by Order dated August 20, 1991.

9. On June 19, 1992, the United States filed it MOTION TO DETERMINE TAX LIABILITIES, in the Debtors' Main Case No. 89–62082, which constituted a contested matter in the Debtors' main case pursuant to Fed.R.Bk.P. 9014. By that Motion the United States sought a determination of the Debtors' joint income tax liabilities for 1984 and the individual income tax liabilities of the Debtor William for 1985 and 1986, pursuant to 11 U.S.C. § 505 ["Tax Motion"].

10. The Tax Motion proceeding filed by the United States in the Debtors' main case No. 89–62082 was consolidated with the previously consolidated Adversary Proceedings, No. 91–6073 and No. 90–6030 on June 24, 1992.[2]

11. A Consolidated Bench Trial was held on Adversary proceeding No. 91–6073 and Adversary Proceeding No. 90–6030 on February 2, and February 3, 1994. In addition, a Consolidated Final Evidentiary Hearing on the § 505 Tax Motion filed by the United States versus the Debtors in their main case was held at the same time. The foregoing were held pursuant to the Court's pre-trial Order of October 22, 1993.

The Plaintiff, United States, in Adversary Proceeding No. 91–6073, and as Movant in the § 505 Tax Motion filed by it versus the Debtors in the main case, appeared by Attorney Peter Sklarew.

The Plaintiff, Dr. Walters, in Adversary Proceeding No. 90–6030 appeared by Attorney James Byron.

The Debtors failed and refused to appear.[3]

---

**2.** The three matters were consolidated because they are interrelated, and had common issues of fact. *See*, Fed.R.Civ.P. 42(a), as made applicable by Fed.R.Bk.P. 7042. Dr. Walters' Adversary Complaint claims that his son, the Debtor William, embezzled and/or converted certain assets of Dr. Walters and eventually, when confronted, signed an agreement to repay $300,000 in respect thereto. The United States' Complaint to revoke the Debtors' discharge is premised upon an inference of fraud on their Schedule of Assets and Statement of Financial Affairs. The United States asserts that inference arises because of the magnitude of the embezzlement/conversion of Dr. Walters' assets and the inability of the Debtors to account for those missing assets. As noted below, shortly before the trial, the United States was granted leave to allege post-petition misconduct as additional grounds for revocation of the Debtors' discharge.

The Tax Motion of the United States filed in the main case No. 89–62082, is also related to the two Adversary Proceedings. It charges the Debtors with income relating to the funds and value of the other property of Dr. Walters that was embezzled or converted. The statutory notices of deficiency which are the subject of the Tax Motion allege certain specific funds and items of property as income and reserve the right to augment the deficiency based on evidence of embezzlement or conversion of additional property that might be adduced in Adversary Proceeding No. 90–6030.

**3.** Both Debtors failed to appear at the commencement of the trial duly scheduled for February 2, 1994 pursuant to the Court's Pretrial Order of October 22, 1993. As attested by counsel for the United States, Peter Sklarew, at the commencement of the trial, he contacted chambers on January 31, 1994, to request that the trial commence at 10:30 a.m. to permit time for Him to fly to Chicago on the morning of February 2nd, rather than travel the preceding night. He called the Walters' residence on the evening of January 31st and spoke to their daughter who immediately conveyed to William, who was heard in the background conversing with said daughter, that the time for the commencement of the trial previously set for February 2, 1994, was 10:30 a.m. Attorney Sklarew further related in open court before the commencement of the trail that after the Debtor William's daughter called out Government counsel's message, the phone was hung up at the Walters' end. Government counsel then reached the Debtor Terry at work, reminded her of the trial date, and notified her that the trial would commence at 10:30 a.m. According to Attorney Sklarew she indicated to him that she would not be attending and Attorney Sklarew warned that he would move to default her. She was then asked to reconfirm the same message to her husband. (*See also*, Exh. aD.)

In addition, at the direction of the Court, the Court's secretary, Nancy Tuerff, made several attempts to reach the Debtors by phone on the morning and early afternoon of February 2, 1994. Several messages were left on a message device at the Walters' residence (219–926–7267) and the taped message played to callers was changed from a male voice to a female voice between two of the calls, indicating that someone had changed the message, and thus had been there or had at least called in for messages. Attempts were also made to reach Terry at her place of employment at St. Mary's Hospital in Hobart, Indiana, using the number of the intensive care unit (219–947–6885) at which Mr. Sklarew had reached her on the evening of January

Submitted. Evidence and arguments heard.[4]

## II

*Consolidated Findings of Fact as to the § 505 Motion filed by the United States in Main Case No. 89–62082, Count I of Adversary Proceeding No. 91–6073, and Adversary Proceeding No. 90–6030*

1. Dr. Walters is the father of the Debtor William and the Plaintiff in Adversary Proceeding No. 90–6030. Dr. Walters is married to Eleanor ("Sandy") Walters, who is not the mother of the Debtor William.

2. In the early 1980s, Dr. Walters and Eleanor Walters resided in Hawaii. (Trial testimony of Dr. Walters.)

3. On March 25, 1981, Dr. Walters and the Debtor William entered a contract for the former to sell the latter the property located at 104 Valentine Court in Michigan City, Indiana ("104 Valentine") for $140,000 if the property was not sold to a third party for $160,000 after listing with a realtor for six months. Full payment was due January 2, 1984. (Exh. S–1; testimony of Dr. Walters.) The Debtors William and Terry moved into 104 Valentine Court in 1983, after a fire damaged their prior residence. (Exhs. aO, aP.)

4. Sometime in 1982, the Debtor William received a commodity futures trading license. Exh. aO at 110, 157–59.

5. The Debtor William filed a previous Chapter 7 petition on April 1, 1982 and received a discharge from the South Bend Division of this Court. He reported *de minimis* assets (other than a residence at 306 Lawn-

dale in Michigan City, Indiana, with no equity), and only $4,000 per year in income during 1980 and 1981. His 1982 bankruptcy schedules do not disclose his contract interest in the 104 Valentine property. (Exh. 3; judicial notice—Case No. 82–30309.) However, on August 6, 1982, the Debtor William signed a commodities account application with Lind–Waldock & Co. indicating annual income of more than $50,000, and a net worth of over $100,000, and further executed a Customer Agreement which represented that the application information was "true and correct.". (Exh. K–3, and ¶ 11 thereof.) The Debtors William and Terry's 1982 joint federal income tax return reports gross income of slightly over $8,000. (Exh. V–1.)

6. On March 8, 1983, Dr. Walters, the Debtor William, and David F. Black agreed that Dr. Walters would allow the latter two to use the former's money to trade in a commodities account with profits to be divided according to a formula, with the principal to remain Dr. Walters. (Exh–Y–1.) Dr. Walters invested at least $55,000 for this purpose. The Debtor William used the previously opened Lind–Waldock account, No. 91DAA 68436 in the name of "William G. Walters," depositing $15,000 of Dr. Walters' money on June 1, 1983, and used $40,000 of Dr. Walters' money to open a second account at Lind–Waldock, No. 91DAA 79459 in the name of "William Grant Walters," on July 20, 1983. (Exhs. N–2, aO at pp. 74–75.)[5]

7. In the early 1980s, the joint income tax returns of Dr. and Eleanor Walters for the late 1970s were audited by the IRS, ultimately resulting in the issuance of deficiency notices in early 1983 asserting very large tax liabilities. The liabilities stemmed largely from the disallowance of tax shelter type

31, 1994. (Testimony of Nancy Tuerff). No calls from either of the Walters were received in chambers that entire day or the next day.

4. *See*, attached appendix "A" for a List of Exhibits Admitted Into Evidence at the Consolidated Bench Trial and Hearing. Unless otherwise noted, references to "Exh." refer to the exhibits introduced at trial on February 2–3, 1994, and unless otherwise noted refer to exhibits of the United States. References to "testimony of ____" refer to the trial of February 2–3, 1994, unless otherwise noted.

5. The amount invested by Dr. Walters may have been higher. The documents produced by Lind–Waldock do not go back further than November of 1983 (Exhs. K–1, K–2) and the earliest Lind–Waldock account statement produced by William is from June of 1983. The Carryover balance in account 91DAA 68436 from May 31, 1983—i.e., before the $15,000 deposit on 6/1/83—was $7,476.50 (Exh. N–2), which may also represent Dr. Walters' funds in light of William's recent 1982 bankruptcy and lack of employment (or other reported income for 1982).

deductions and not from the failure to report income. (Testimony of Dr. Walters.)

8. Although the Debtor William had paid at most $20,000 towards the $140,000 contract amount for the 104 Valentine property, in May of 1983, a deed from Dr. Walters to the Debtor William was recorded with a purported execution date of January 2, 1983—some four months earlier. (Exh. aO at pp. 62–66, 90–92.)

9. Soon after the Debtor William moved into the 104 Valentine residence, he told his sister, Penelope Ropar, something to the effect that—I got the house, and someday I'll get everything, referring to Dr. Walter's assets. Dr. Walters was not made aware of this. (Testimony of Penelope Ropar.)

10. After the joint income taxes of Dr. and Eleanor Walters were assessed, the Internal Revenue Service ("IRS") began seizing their assets in Hawaii. (Testimony of Dr. Walters.)

11. In 1984, Dr. and Eleanor Walters moved to the Cayman Islands, and Dr. Walters enlisted the willing assistance of his son, the Debtor William in secreting his assets and aiding in the removal thereof from the jurisdiction of the United States in a manner designed to frustrate the collection of those taxes. (*Id.;* Exh. aU at 31–33. *See also* Exhs. R–2, T–1.)

12. Throughout 1983 and 1984, the Debtor William did not maintain a checking account and often used the Debtor Terry's checking account to negotiate checks payable to Dr. Walters and then purchase cashier's checks using false names. The Debtor William usually sent the cashier's checks to Dr. Walters. The Debtor Terry was aware of and participated in the transactions by endorsing the checks for deposit and permitting the withdrawals. (Testimony of Dr. Walters; Exhs. H, aO, aP, aQ, aR, aU.) Some of the checks were payable to Eleanor Walters' mother, Elizabeth Dockim and endorsed by her and then the Debtor Terry, reflecting the fact that Dr. Walters held securities in a Merrill Lynch account in Dockim's name. (*Id.*) This included $70,000 (two $35,000 cashier's checks) on July 1, 1984, which were

payable to Philip Sutcliffe and endorsed by him for the Roy West Trust Corp. (Cayman), Ltd. for account C1550X. (Exh. I5.) "C1550X" refers to an account controlled by Dr. Walters at the Grand Cayman, Cayman Islands office of Roy West Trust Corporation, of which Sutcliffe was an officer (hereinafter "the Roy West account"). (Testimony of Dr. Walters.)

13. At first occasionally, so as to escape notice, and eventually more blatantly, the Debtor William kept some of the proceeds of Dr. Walters' securities and other property, as indicated in more detail below.

14. Possibly the earliest diversion of Dr. Walters' funds by the Debtor William occurred on January 6, 1984, when the Debtor William withdrew $19,000 in principal from one of the two Lind–Waldock accounts (No. 91DAA 79459), and returned only $14,000. (Exhs. K–1, N–3.) At the time, the combined balance of the two accounts was about $39,000 (Exhs. K–1, K–2), and the withdrawal thus represented a portion of the principal investment of Dr. Walters under the agreement between him and the Debtor William and David Black. (Exh. Y–1.) The Debtor William endorsed the $19,000 Lind–Waldock check (Exh. K–4) to the Debtor Terry who, in turn, negotiated it at her at Lakeshore Bank on January 9, 1984, while purchasing a $14,000 bank check which was re-deposited into the Lind–Waldock account (Exhs. I–1, K–1, N–3). The difference of $5,000 was deposited into the Debtor Terry's checking account and was expended gradually. (Exhs. I–1, H.)

15. On September 19, 1984, the Debtor William withdrew the balance in Lind–Waldock account No. 91DAA 79459 (Exh. K–1) in the form of a check to himself for $14,804.27 (Exh. K–4), which was also endorsed to the Debtor Terry and which she then deposited into her checking account at Lakeshore Bank along with an additional $120 (Exhs. K–4, I–3). Part of these funds, $7,130, were then used to purchase a bank check to Dr. Walters for $7,100, dated September 26, 1984, which he endorsed and gave to Joe CasioBarrin (Exh. I–3).[6] Part of the rest of the

6. Dr. Walters testified that CasioBarrin falsely

represented himself as an attorney who was to

$14,804 from Dr. Walters was expended gradually from the Debtor Terry's account while $4,500 may be traced to a October 19, 1984 check for that amount, payable to Lakeshore Bank, the ultimate disposition of which is not known. (Exh. I–4.) The other of the two Lind–Waldock accounts is discussed below.

16. During a 1987 deposition taken in United *States v. William G. Walters, et ux.,* Civil No. S86–458, in the District Court for this district (hereinafter "the District Court case"), the Debtor William testified that he did not owe Dr. Walters anything other than the balance owed on the 104 Valentine contract and that he had never borrowed and then repaid any large sum of money from Dr. Walters. (Exh. aO at pp. 76–77.) At that time, he also falsely characterized the Lind–Waldock trading account as being strictly for Dr. Walters, and falsely claimed to have returned all of the funds to Dr. Walters without having conducted any trading. (*Id.* at 74–75.) Similarly, during his Rule 2004 examination on May 2, 1991, the Debtor William testified that all the monies at Lind–Waldock were returned to Dr. Walters. (Exh. aQ at 70–71.)

17. On June 4, 1984, Dan Roszkowski, the Debtor Terry's brother, who was an account representative at Blunt Ellis & Loewi ("BE & L"), opened a brokerage account for the Debtor William, No. 8133–0522, under the name "William H. Walters" (but using the Debtor William's correct social security number). (Exh. B–1, B–4.) Dan Roszkowski, at the time of his deposition in these proceedings on July 14, 1992, thought that his brother-in-law's name was William H. Walters and was surprised to learn this was not the case.

He clearly understood himself to have transacted business on behalf of his sister's husband, not his sister's father-in-law. (Exh. dC.) *See* F.R.E. 803(3).

18. Dan Roszkowski, in his capacity as broker, received (on June 8) and sold (on June 11) for the Debtor William several municipal bonds and one San Diego Gas & Electric Co. bond in the name of Dr. Walters, netting $24,756.37, which was withdrawn in the form of a BE & L check in that amount payable to William H. Walters dated June 25, 1984. (Exh. N–1, B–2).[7] The Debtor William endorsed the $24,756.37 BE & L check (as "Wm H. Walters") and the Debtor Terry endorsed it and deposited into her checking account at Lakeshore Bank with an additional $100 on June 27, 1984. (Exh. B–2, I–2, Q–3.) On July 2, 1984, she wrote a personal check to buy a cashier's check for $20,000, payable to Heusen E. Handfield, using a false remitter's name (Sterling Peak). The check was negotiated by Heusen E. Handfield to the account of Caicos Business Services at Barclay's Bank in Grand Turk in the Turks and Caicos Islands in the Bahamas. (Exh. I–2.) The remaining $4,756.37 remained in the Debtor Terry's account and is not fully accounted for.

19. The Debtor William claimed in his deposition on July 14, 1992, that the $20,000 check to Heusen E. Handfield was sent pursuant to his father's instructions to the Roy West account that Dr. Walters maintained. (Exh. aU at 27–28, 146–47.) Dr. Walters testified that this is not true, that checks he received were sent to Grand Cayman, not Grand Turk, and that he never heard of Heusen E. Handfield or Caicos Business Services. The Court finds that the Debtor Wil-

---

help Dr. Walters recover funds taken by Paul Robinson, but that CasioBarrin was later discovered by new counsel for Dr. Walters not to be an attorney.

7. The transactions were reported under a different account number, 8133–0514, which had been opened by a "William Walters" in 1982 for the purpose of negotiating a de minimis amount of Inland Steel Co. stock. The 1982 account application and transactions are revealed by Exhs. B–2, B–3, and B–3a. They reflect a social security number and age different from either William or Dr. Walters and an address not recognized at trial by Dr. Walters or Penelope Walters. It may

be assumed that the 1982 transactions involved an unrelated William Walters. Note that the 1984 account statement, although reporting William's transactions under the 1982 account number, use his correct social security number, as indicated on the 1984 account application (and add the middle initial "H" which is not indicated anywhere on the 1982 documents). The most logical explanation is that BE & L erred in placing the 1984 transactions under the old account number and should have used the new account number indicated on the 1984 application.

liam directed the disposition of these funds for his own benefit, either without, or contrary to, instructions from Dr. Walters. The Court bases this finding in part on the fact that two cashiers checks dated only one day earlier for $35,000 each were sent to the Cayman Islands, not the Turks & Caicos, and received by Dr. Walters. (*See* ¶ 12 above.) Further, it appears from the Debtor William's own Rule 2004 examination testimony on May 2, 1991, that an attorney named Ian Miller in the Turks & Caicos Islands established a corporation, Keliter Corporation, the stock of which was owned by the Debtor William, for the purpose of maintaining an offshore trading account. (Exh. aQ at 29–30.) Subsequently, in his July 14, 1992 deposition, the Debtor William clarified that this was the Jack Carl account referred to below. (Exh. aU at 20–21. *See also*, aQ at 63.) Although he then claimed that Keliter corporation was not his, this contradicted his earlier 2004 examination testimony, and the funds in the Jack Carl account clearly were used by him for his own benefit as described below. The Debtor William also admitted that "Keliter" is a contraction of Kelly, Lisa, and Terry—the first two being the names of his daughters and the latter his wife. (Exh. aQ at 38–39.) Finally, at one point in his Rule 2004 examination the Debtor William referred briefly and vaguely to an account in the Bahamas (*Id.*, at 72), although he elsewhere denied having any accounts outside the country other than the one Swiss account discussed below.

20. Dr. Walters had maintained investment accounts at Guardian Trust Company in Toronto, Canada, which he transferred to the Debtor William in March of 1984 to enable the latter to manage it for him. (Testimony of Dr. Walters; Exh aQ at p. 51. *See also*, Exhs. 0–2, T–1, T–2.) In late October of 1984, the Debtor William liquidated a gold fund account at Guardian Trust and obtained $26,972.52 Guardian Trust check made payable to Roywest Trust Corp. (Cayman) Ltd. (Exh. T–1.) Dr. Walters acknowledged receiving these funds. (Testimony of Dr. Walters.)

21. Some time in late 1984, Dr. Walters asked the Debtor William to open a Swiss bank account, and to send some of the funds in the Guardian Trust account there. (Testimony of Dr. Walters.) On November 5, 1984, Guardian Trust, at the Debtor William's direction, wired $32,854.78 in U.S. dollars to Swiss Bank Corporation in Basel, Switzerland, for the benefit of William G. Walters, Acct. # 11–806'964.1. (Exh. T–2.)

22. On November 12, 1984, Dr. Walters wrote the Debtor William and requested that he send cashier's checks with false remitter names in amounts under $10,000, including any amount left in the Merrill Lynch account in Elizabeth Dockim's name. He further requested that the Debtor William wire larger amounts to Morgan Guaranty Trust Co. in New York for the benefit of "RWC Clearing Account No. 652–40–850 Ref. Client "C1550X," referring to the Roy West account in the Cayman Islands. Dr. Walters' letter notes that "[t]here's no word to feds or govt. and no trace," and specifies: "This for balance of Guardian and what's in Swissy." (Exh. R–2, emphasis added.) Anticipating a visit from the Debtor William's family for the upcoming Christmas holidays, Dr. Walters also requested the Debtor William to carry bearer bonds in his luggage. The letter further reflects the reason that Dr. Walters wanted the money—certain investments he had made with a Paul Robinson in 1981, which the letter estimates at $1.5 million, had been allegedly misappropriated by Robinson. Dr. Walters testified to this effect at trial and indicated that Robinson was convicted of some kind of financial crime and sent to prison. (The Court does not know if this testimony was based upon first-hand knowledge and does not address its accuracy, except to note that the records associated by the IRS with the Debtors William and Terry's 1983 joint income tax return (Exh. V–2) include a copy, sent to the IRS by the Debtor William, of a June 28, 1985 letter from the Department of Justice offering the Debtor William use-immunity to testify before a grand jury, and that the Debtor William's 1987 deposition testimony in the District Court case appears to agree with Dr. Walters' testimony on these points. (Exh. aO at pp. 50–54).)

23. The Debtor William complied with the foregoing request only in part. He caused Swiss Bank Corporation to wire $30,000 on December 3, 1984, which was ultimately deposited into the Roy West account in the Cayman Islands. (Exh. R–3; testimony of Dr. Walters.) However, this left over $2,800 in the Swiss Bank Corporation account. (Exh. 0–1.) [8] The disposition of this $2,800+ is discussed below.

24. Additional funds were also left with Guardian Trust. (Exh. 0–2.) While there is no documentation of status of the Guardian Trust account between the date of Dr. Walters' letter, November 12, 1984, through the end of the month, the opening balance of U.S. dollars for the month of December, 1984, was $4,339.47, and $4,000 was withdrawn on December 14, 1984. The balance remained in the account at least through the end of 1985 (after which there is no further documentation produced). (Exh. 0–2.) Additionally, the Guardian statements show a Swiss Franc cash position of $24,670.94 SF valued at $9,506.61 as of December 31, 1984. The Swiss Francs were sold on March 6, 1985, netting $8,314.07, which was withdrawn on that date. (*Id. See also*, Exh. T–2.)

25. The Debtor William told the IRS criminal investigator on June 26, 1989 that the $4,000 withdrawn from Guardian Trust on December 14, 1984, and the $8,314 withdrawn on March 6, 1985, were wire-transferred to the Swiss Bank Corporation account, just like the $30,000 on December 3, 1984. (Exh. W–2. *See also*, Exh. aQ at pp. 51–52.) However, the Swiss Bank account records he subsequently produced (after the entry of the Court's November 25, 1991 ORDER COMPELLING DISCOVERY) do not show any such deposits. (Exh. 0–1.) [9] Neither do the $4,000 or $8,314 appear to be reflected in any other bank, brokerage, or trading account records produced by the Debtor William. The Court finds that Dr. Walters never received these monies. (Testimony of Dr. Walters.)

26. From May of 1985 through June of 1987, the Debtor William maintained a checking account and a savings account at the Michigan City Catholic Federal Credit Union ("MCC"). (Exh. P–1 through P–9.) The savings account was in his name and the checking account was in the name of "Keliter Corporation" (which appears on the checks), and the two accounts were tied together. (Exh. aQ at p. 51.) The Debtor William's testimony during these proceedings regarding the purpose and ownership of the Keliter account at MCC (i.e., whether it was his, his father's, or his wife's) was strikingly evasive and inconsistent at times. (Exh. aQ at 36–38, 51, 59; Exh. aU at 65.) During an insurance claim deposition taken on March 24, 1987, by Republic Insurance in respect to a theft claim, the Debtor William, when asked, "What is Keliter Corporation?," testified that it was just "a name" he used "on a checking and savings account at the Catholic Credit Union in Michigan City," and that it "is not a corporation." He then made it clear that the account was strictly his and for personal use. (Exh. Z–1, at pp–36–40.) The checks drawn on the account reflect numerous expenditures for the benefit of himself, his wife (including many checks paid directly to the Debtor Terry), and his children. The Court finds that the account was strictly his own for personal purposes. Many of the transactions described below involved this MCC account.

27. As indicated above, over $2,800 was left in the Swiss Bank Corporation account after the December 3, 1984 wire of $30,000 to the Roy West account in the Cayman Islands via Morgan Guaranty in New York. The Swiss account records eventually produced by the Debtor William show that, contrary to his testimony that all of the funds were returned to Dr. Walters, the following occurred. First, $2,300 was transferred by Swiss Bank Corporation on September 4, 1986, to Citibank in Buffalo, New York, where a bank check was issued to the Debtor

---

8. Exhibit 0–1 is in reverse chronological order. Note also that the Canadian and Swiss documents use dates with the day indicated before the month so that, for example, "3.12.84", refers to the 3rd day of December, 1984.

9. *See* REPORT ON DOCUMENT PRODUCTION AND ON THE STATUS OF DISCOVERY GENERALLY, filed April 30, 1992, to which no objection was made.

William G. Walters in that amount on September 9, 1986. (Exh. 0–1, D.) On March 20, 1987, the balance in the Swiss account, $505.20, was similarly transferred to Citibank for the Debtor William G. Walters. (Exh. 0–1.) The $2,300 Citibank check was negotiated by deposit of $1,000 to the MCC account on September 12, 1986, and the rest taken in cash at the time. (Exh. L.) It is not known where the Debtor William negotiated the subsequent $505.20 check.

28. As noted above, some of Dr. Walters' money invested in Lind–Waldock account number 91DAA 79459, pursuant to the agreement among himself, the Debtor William, and David Black, was misappropriated by the Debtor William. It is difficult to ascertain from the limited documents available whether any of Dr. Walters' funds in the other Lind–Waldock account, number 91DAA 68436, were similarly misappropriated. The records have gaps during which the balance was reduced, and also reveal significant trading losses. There are transfers to the MCC account, with further transfers for the benefit of Dr. Walters (for example, to attorneys he retained). There are other transfers to the MCC account which were used for the benefit of the Debtor William, but there are also deposits to this Lind–Waldock account the ultimate source for which is not indicated by the evidence available. Assuming no diversion of other property of Dr. Walters as a source of the deposits, the records reveal substantial investments by the Debtor William of new money, the source of which is, at best, not explained. (Exhs. K–2, K–4, K–5, L, P–5, P–6 (stub ## 137, 193, 202).)

29. Dr. Walters has been an investor in and a collector of rare numismatic coins and also an investor in bullion coins since before 1980 and, by 1984, had accumulated a valuable coin collection worth hundreds of thousands of dollars. (Testimony of Dr. Walters. Exh. aA–1, aA–2, aA–3.)

30. In May of 1984, Dr. Walters required surgery to remove a cancer and planned to have this surgery in Chicago. Prior thereto, he sent his coin collection to the residence of Eleanor Walters' mother, Elizabeth Dockim. (Testimony of Dr. Walters.) Dr. Walters was worried he might not survive. (*Id.*;

Exh. aO at p. 147.) Therefore, Dr. Walters retrieved the coins and brought them to 104 Valentine Court to leave with his son the Debtor William for safe-keeping. A substantial quantity of these coins was either liquidated by the Debtor William or remain unaccounted for, as further recited hereinbelow. The Debtor William claims that the coins were a gift to him, also as further recited hereinbelow. The Debtor Terry testified in her Rule 2004 examination that the Debtor William had never thereafter told her of any financial transactions between Dr. Walters and her husband at this time in 1984. (Exh. aR at p. 66.) The Court finds that, at the time of the transfer of custody in May of 1984, no gift of the coins was indicated, but rather it was expressly stated to the Debtor William that the coins were being left with him for safe-keeping. (Testimony of Dr. Walters, Eleanor Walters.)

31. At the same time, Dr. Walters executed a power of attorney to his son the Debtor William, in case Dr. Walters became incompetent or did not survive the surgery. (Testimony of Dr. Walters; Exh. aO at p. 149. *See also*, Exh. Y–3.)

32. In 1971, Dr. Walters established an irrevocable trust at Citizens Bank of Michigan City, Indiana, with the corpus divided in half so that half the income would go to his wife and half to his children while minors with the remainder to be distributed to his children in installments at various ages. (Exh. U–1.) The corpus of the trust (Exh. U–1, schedule A) consisted of five whole life insurance policies.

33. By letter dated 5–29–85 (Exh. U–2), the Debtor William, signing as "William H. Walters," directed Citizens Bank to inform the life insurance companies that he wished to borrow the maximum value available on the five policies forming the corpus of the trust. (Exh. aU at p. 132; testimony of Dr. Walters.)

34. The bank followed the Debtor William's directions and the result was the issuance of various checks from the life insurance policies as follows: (1) Penn Mutual Life Ins. Co. check dated 6/21/85 in the amount of $6,355.58 to Citizens Bank as Trustee, (2)

New York Life Ins. Co. check dated 7/02/85 in the amount of $8,792 to William H. Walters, (3) New York Life Ins. Co. check dated 7/02/85 in the amount of $9,235 to Citizens Bank as Trustee, and (4) New York Life Ins. Co. check dated 7/3/85 in the amount of $8,721 to Citizens Bank as Trustee. (Exh. U–3.) The fifth policy was with National Service Life Ins. Co., which apparently did not send a check. The first three of the four aforementioned checks, totaling $24,382.58, were all deposited into the Debtor William's MCC accounts on 7/9/85, with $17,000 added to the checking or "draft" account and $7,382.58 added to the regular savings account. (Exh. L.) The fourth check for $8,721 was negotiated at MCC on 7/11/85 with $7,221 added to the savings account and $1,500 taken in cash. (*Id.*) The Debtor William endorsed all four checks (along with Citizens Bank). (Exhs. U–3, aU at 133; testimony of Dr. Walters.)

35. Although the Debtor William has suggested these loans were effected at his father's instructions (Exh. aU at 132), and that some of the money was turned over to Dr. Walters (Exh. aQ at 72), Dr. Walters denies he gave any such instructions and denies receiving any of the proceeds (testimony of Dr. Walters). At one time, the Debtor William told an IRS criminal investigator that all of the life insurance proceeds were returned to Dr. Walters (Exh. W–2), and that is plainly false, as revealed in the following paragraph. The Court finds that the Debtor William procured the life insurance loans fraudulently and without any authority or suggestion and that he kept the proceeds for his own use and benefit. Although the Debtor William also claimed that some of the loan proceeds were sent back to the life insurance companies from the Keliter account (Exh. aU at 133), any such repayments were *de minimis* based upon a review of the MCC account records.

36. With respect to the $17,000 deposited in the MCC checking account, the Debtor William immediately wrote a check from Keliter Corporation to Four Flags Chrysler for $15,425 for the purchase of a brand new Chrysler Fifth Avenue. (Exh. P–1, # 117; Exh. X–3). He then titled the car with the Indiana Bureau of Motor Vehicles in the name of Keliter Corporation. (Exh. X–3.)

37. Dr. Walters claims that the Debtor William misappropriated a substantial amount of Swiss Franc traveler's checks. By letter dated February 4, 1986, Citizens Bank sent the Debtor William copies of two currency transaction reporting forms ("CTRs"), under cover letter indicating they were about to be filed with the IRS in order to comply with federal laws requiring the reporting of two related transactions liquidating Swiss Franc traveler's checks on January 31, and February 3, 1986 for the amounts of $8,116 and $8,321 respectively, for a total $16,437 in U.S. currency. (Exh. aG.) In his July 14, 1992 deposition in these proceedings, the Debtor William admitted receiving currency for these traveler's checks but claimed that Dr. Walters may have picked up this currency. (Exh aU at 69–70.) Dr. Walters denied this at trial. The disposition of these funds is not revealed by any financial records. Given that the Debtor William had already kept other funds belonging to Dr. Walters, and further given that these transactions occurred after attorney Donald Clark came to retrieve Dr. Walters' coin collection on December 4, 1985, as discussed below, the Court finds that the Debtor William's claim that Dr. Walters picked up these funds is not credible. Additionally, the record contains evidence that the Debtor William had just opened a second Swiss bank account, which his deposition testimony refers to as the "undeclared" account. While he insists that he never deposited any funds into this account, the letter from Swiss Bank Corporation indicates that the bank officer expected to receive traveler's checks for the initial deposit. (Exh. aH.) The Court finds that the Debtor William kept the proceeds of the traveler's checks for his own benefit, whether or not he deposited them into the Swiss account.

38. In late 1985, after becoming concerned that the Debtor William might not be dealing with him squarely, Dr. Walters determined to retrieve his coin collection. He sent his Washington, D.C. attorney, Donald Clark, to Indiana to pick up the coins and Mr. Clark indeed picked up a substantial

part of the coin collection on December 4, 1985.

39. The coins that Donald Clark retrieved were reflected in a hand-written inventory made and approved in the presence of Mr. Clark, the Debtor William, and the Debtor William's attorney, Atley Price. The inventory is signed by all three and initialed by them on every page, and, before listing the coins, begins:

> On this date, I delivered possession of, and responsibility for, the following property *of William H. Walters* to his attorney Donald O. Clark of ... pursuant to the written request and instructions of said William H. Walters presented to me by said Donald O. Clark.

(Exh. aA–1; emphasis added) Nowhere is there any indication that the coins belonged to the Debtor William by virtue of a prior gift that he was now allowing his father to revoke, as since claimed by him before the IRS (Exh. W–2), and during his Rule 2004 examination in these proceedings (Exh. aQ at 67).

40. On December 4, 1985, the Debtor William, as he later admitted during his Rule 2004 examination, told Don Clark that these were all of Dr. Walters' coins. (Exh. aQ at p. 53.)

41. The handwritten inventory of coins returned on December 4, 1985, was transcribed by others into a typed inventory and checked against the coins after Mr. Clark returned to Washington, D.C. (Exh aA–2), and both inventories were given to Dr. Walters.

42. Soon after receiving the coins and inventories, Dr. Walters compared them to his receipts for coins purchased over the years and made an inventory of coins missing—i.e., those entrusted to the Debtor William but not returned on December 4, 1985. (Exh. aA–3.)

■ 43. At the same time he sought to retrieve his coin collection, Dr. Walters advised the Debtor William and Atley Price,

the attorney who prepared the May 3, 1984 power of attorney to the Debtor William, that the power was revoked. The revocation was immediately confirmed by a written receipt from Atley Price given to Don Clark, and the revocation was confirmed in writing by Dr. Walters sometime later. (Exh. Y–3.) Atley Price indicated to Dr. Walters that the power would be destroyed, although the Debtor William in fact retained the original without destroying it. The Debtor William continued to use it. (Exh. aO at pp. 135–40; Exh. aU at 59.)[10] Before this revocation, Dr. Walters had not mentioned the power at all since it was given before he had surgery. (Exh. aO. at p. 151.)

44. Dr. Walters traveled to Indiana in April of 1986 in order to confront the Debtor William about the missing coins and also to retrieve additional personal belongings left at the 104 Valentine property. On April 7, he did so confront the Debtor William. As a result, the Debtor William gave Dr. Walters approximately 17 to 20 additional coins, most of them $3 gold pieces of American mintage, and a couple of $2½ gold pieces. (Exh. aO at pp. 102–04; testimony of Dr. Walters.) The Debtor William told Dr. Walters again that this was all that was left of the coin collection—i.e., that the Debtor William had no other coins to return. (Testimony of Dr. Walters.) These 17 to 20 coins did not contain any remarkable value. (Exh. aO at pp. 102–03; testimony of Dr. Walters.)

45. During the same visit, Dr. Walters accused the Debtor William of having misappropriated the rest of his coin collection and other property and the Debtor William offered to sign a promise to repay the value of what he had taken. The Debtor William then hand wrote a note on lined paper in the following form and signed as follows:

4–7–86

Wm H Walters Will Receive From me $300,000 Payment For items which I took on or BeFore April 7– 1986

---

**10.** He asserted the Fifth Amendment privilege in refusing to state, during the 1987 deposition, whether he used the power after its verbal revocation. An adverse inference is permissible.

*Baxter v. Palmigiano*, 425 U.S. 308, 319, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976). His July 14, 1992 deposition in these proceedings makes it clear he did use the power.

Wm G Walters

Witness: 4–7–86 P. Ropar
Eleanor E. Walters

(Exh. Y–5, irregular letter cases in original.) Although the Debtor William testified during his Rule 2004 examination (Exh. aQ at pp. 54–55) that Penelope Ropar and Eleanor Walters did not in fact witness the note and testified in a deposition taken for Dr. Walters that it was signed under physical threat from Dr. Walters (Dr. Walters Exh. 1 at p. 44), the Court credits the testimony of Penelope Ropar and Eleanor Walters. The latter agreed that she did not accompany the Debtor William and Dr. Walters upstairs to the room where the document was signed, but that she signed as a witness when they came downstairs and in the Debtor William's presence where he did not deny his signature or object in any way. Ms. Ropar testified that she did go upstairs and did witness her brother sign the document (while Eleanor Walters waited downstairs). The Court has observed the physical stature of the Debtor William in comparison to Dr. Walters and finds that there was no possible basis for any fear by the Debtor William of bodily harm caused by Dr. Walters.

46. During the trial, Dr. Walters was qualified as an expert witness respecting the trading and valuation of rare numismatic coins. He opined that the value of the coins missing from his collection—i.e., those listed on the inventory of coins not returned as of 12/4/85 but not including those coins returned on 4/7/86—was approximately $225,000 now and approximately $150,000 to $175,000 in 1984. The Court finds that the value of the coins not returned was approximately $162,500 in 1984 (the time at which the Court concludes they were misappropriated as indicated below).

47. The Debtor William's statement that he had no coins left as of 4/7/86 (like his similar statement to Donald Clark on 12/4/85) was demonstrably false. For example, shortly thereafter on 5/30/86, he sold some of Dr. Walters' coins to Coin Investors Coin Shop for $2,850. (Exh. X–1.) He later returned to Coin Investors Coin Shop with a 1903 gold dollar issued as a "commemorative" coin valued by Coin Investors at approximately $13,-000 for which the shop gave the Debtor William a receipt indicating the coin was "received on consignment 7/18/86," and later received a similar consignment receipt dated 8/12/86 for an "1879 PROOF SET impaired condition PR–60 and approx value $4,000." (Exh. aQ at 126–30 and exh. 6 thereto.) The 1903 dollar and 1879 proof set appear to be reflected on Dr. Walters' inventory of missing coins, as item number 79 and 35 respectively. (Exh. aA–3.) The Debtor William admits these were derived from Dr. Walters' coin collection. He stated that they were never really consigned to Coin Investors but only brought there for grading as he did not wish to sell them. He had no idea of what became of these coins, unless they were part of the Nunemaker's transactions, discussed next. (Exh. aU at pp. 125–30.)

48. The Debtor William admits that he sold some of Dr. Walters' coins to Nunemaker's Coins Shop on October 22, 1986, for $19,000. (Exhs. W–2, aU at pp. 82–84, 143.) This appears to have been a sale of 50 identical bullion coins for $380 each rather than as sale of rare numismatic coins. (Exh. aU at p. 143–44.) Thus, the coins listed in the Coin Investors Coin Shop consignment receipts remain unaccounted for.

49. The Debtor William also admits that he liquidated some coins at Engstrom's coin shop, although the precise timing is not known. (Exhs. aQ at p. 69, aU at 141–42.) The Court finds, based upon the Debtors William and Terry's failure to rebut the deficiency notices issued by the IRS, that the Debtor William received $20,000 from coin sales to Engstrom in 1985 and another $10,000 in 1986. (Exh. V–13. *See also,* W–2.)

50. Notwithstanding the admissions made initially to the IRS on June 26, 1989 (Exh. W–2), and to the United States during discovery in No. 91–6037 on July 14, 1992 (Exh. aU), the Debtor William testified in his deposition taken on behalf of Dr. Walters in No. 90–6030 on April 24, 1991, that he did not sign the Nunemaker's check or sell coins there and that he did not recall any transactions at Coin Investors. (Dr. Walters' Exh. 1 at pp. 61–62.)

51. The Nunemaker's check for $19,000 conspicuously leaves out any middle initial, but was endorsed by the Debtor William (Exh. X–4), and was negotiated at MCC where $16,000 of it was deposited into the Keliter checking account, and $3,000 taken in cash. (Exhs. L, P–6 (stub # 212).) Two days later, on October 24, 1986, $10,000 was wire transferred from that account to the Keliter trading account at Jack Carl Associates Inc. (Exhs. L, N–4, P–6 (stub # 220)). These funds were carried in the account for the most part until an account closing withdrawal of $8,368.38 on March 9, 1987. (Exh. N–5.) The Jack Carl check in that amount was negotiated at MCC on March 12, 1987, by deposit of $6,368.38, plus $2,000 cash. (Exh. L.) The funds were then gradually dissipated. (Exh. P–9.)

52. On August 16, 1986, the Debtor William paid ANACS to grade a $1 gold commemorative coin, that appears to have been from Dr. Walters' collection. (Exh. P–5 (check # 195); (testimony of Dr. Walters.) In fact, this may be the same as the 1903 gold dollar referenced in the Coin Investors consignment receipt. (See ¶ 47 above.)

53. The Debtor William opened a line of credit account, using the name Dr. William H. Walters, with American Express Centurion Bank of Newark, Delaware. (Exh. X–6.) Dr. Walters knew nothing about the account. (Testimony of Dr. Walters.) On December 16, 1986, the Debtor William wrote a check for $6,000 on this account, payable to "Keliter Corporation," and deposited into his MCC account. A similar check was written for $4,000 on January 13, 1987, and deposited at MCC. (Exhs. X–6, L, P–5 (stub # 230 and # 232), and P–9 (stub # 242).) During his deposition by counsel for the United States in 1992, the Debtor William falsely testified that, during the past ten years, he had no accounts of any kind, including bank accounts or line of credit, accounts, other than the MCC account. (Exh. aU at pp. 64–65.) In contrast, having been confronted by Dr. Walters' counsel at a deposition a year earlier with copies of these checks, the Debtor William admitted there was a line-of-credit account he had opened up and that the checks were deposited into the Keliter ac-

count at MCC, but he tried to suggest that Dr. Walters was involved with the MCC account and that this was done for him. (Dr. Walters Exh. 1 at p. 86–87.) The Court finds that the Debtor William obtained these funds for himself and at his own instance, and never intended to repay the line of credit balance.

54. In the beginning of 1985, long before the IRS ever asserted that money received for Dr. Walters but not sent to him constituted income, the Debtor William was advised by his own accountant, John Angelos, in the presence of his own attorney, Atley Price, to report as income on his 1983 income tax return (which he was late in filing) the difference between what he received for Dr. Walters and what he sent to Dr. Walters. (Exh. R–1.) The Debtor William then wrote to this accountant on March 14, 1985, acknowledging that funds that were paid to Dr. Walters belonged to Dr. Walters. (Exh. R–1a.)

55. On March 18, 1985, the Debtors William and Terry signed a joint 1983 income tax return, which they did not file with the IRS until February 28, 1986, reporting as income (as recommended by accountant John Angelos) the monies received for but not sent to Dr. Walters. (Exh. V–2, Form 1040.) Since the resulting tax was not remitted, this caused the IRS to demand payment and then file a notice of federal tax lien in the amount of $9,909 in tax, $4,152 in penalties, and $3,125 in assessed interest, or $17,186. (Exh. V–2, Request for Payment; Exh. aE, Schedule A–2; SUBSTITUTE PROOF OF SECURED CLAIM OF INTERNAL REVENUE SERVICE, filed by debtors on March 5, 1990.) The 1983 year is not at issue in the Tax Motion proceeding.

56. By letter dated 5/20/86, the Debtor William wrote to the IRS and claimed that it was an error to have put the funds he retained from his father on this 1983 income tax return, because the money "was never mine," explaining further that "My father endorsed checks and had me cash them for him and, in turn, give him the money." (Exh. V–2 (documents associated with tax return).)

57. On May 23, 1986, the Debtors William and Terry signed their 1984 joint income tax

return, which was received by the IRS on May 27, 1986. (Exh. V–3, V–12a.)[11] It reports gross income of "O," and therefore no tax due (or previously paid).

58. Also on May 23, 1986, the Debtor William signed his 1985 individual income tax return, also received by the IRS on May 27, 1986 (presumably the two returns were mailed together). (Exh. V–4.) It reports "O" income and therefore no tax due (or previously paid), but does indicate the taxpayer's occupation as "self-employed." The Debtor Terry filed separately on April 10, 1986 (i.e., before signing the 1984 joint return), reporting wages of $2,961.46. (Exh. V–6.)

59. On April 3, 1987, the Debtor William signed his 1986 individual income tax return (Exh. V–5), received by the IRS on April 1987 (V–12a). Again it reports "O" income and no tax, and this time lists his occupation as "commodity broker." The Debtor Terry filed separately again, reporting gross wages of $2,875.98. (Exh. V–7.)

60. The Debtors William and Terry returned to joint filing status on their 1987 return, signed on February 8, 1988, under the Debtor Terry's name first. (Exh. V–8.). It reports $10,218.03 in gross wages for the Debtor Terry, and no income for the Debtor William (whose occupation is indicated as "C.T.A."—for commodities trading advisor). They similarly filed a joint return for 1988 (Exh. V–9), signed on August 2, 1989, but not filed until September 17, 1990. It indicates $22,748.57 in gross wages for the Debtor Terry and no income for the Debtor William.

61. In early 1986, the 104 Valentine property developed a leak in the roof by which water made its way to the basement ceiling where it damaged the same and disturbed asbestos. The Debtor Terry then submitted a claim, by way of a "Sworn Proof of Loss" with Illinois Farmers Insurance Company for damage to the dwelling and personal property contained therein stemming from the spread and deposit of asbestos particles. (Exh. Z–4.) This claim, hereinafter referred to as the "asbestos claim," estimates the cost of restoring the dwelling as being in excess of the policy limit of $300,000 in respect thereto. It then schedules $360,188 worth of supposedly damaged personal property, including furniture (some antique), consumer electronic goods, art work, clothing, appliances, a grand piano, and miscellaneous. The number and value of the TVs and other consumer electronic equipment and the extent of the clothing is so vast as to be almost fraudulent on its face, even though the funds derived from Dr. Walters as described herein, when added to the debtors' reported income over the years, could arguably account for the property from a strictly numerical standpoint.

62. Notwithstanding the obvious overstatement of the extent of the clothing and the overvaluation of the many of the items scheduled on the asbestos claim, it is clear from the claim and the 1987 testimony of both debtors given in the District Court case that the debtors did in fact own the consumer electronics items, furniture, rugs, grand piano, and appliances listed. Exclusive of clothing, well over $100,000 was claimed. It is equally clear from their Rule 2004 examinations in this case that they did not discard the purportedly damaged personal property but rather cleaned and retained it (at least at first) after a settlement of the insurance claim for $7,500, much of which was paid to the IRS under the Settlement Agreement in the District Court case discussed below.[12]

---

11. Exhibit V–12a—constituting the Certificates of Assessments and Payments (Forms 4340) for the tax years in question—was not part of the United States' original pretrial exhibit list and was attached to the supplemental pretrial submission filed October 20, 1993, which noted that the original list stated that the Forms 4340, when received would be substituted for Exh. V–12. Exhibit V–12a was admitted into evidence at trial.

12. As noted by Government counsel at trial, the insurance settlement did not reflect a major concession by Terry respecting the value of the subject personal property. The insurance company focused its defense primarily on two contentions: (1) that Terry committed fraud in procuring the policy, such that it was unenforceable, and (2) that the asbestos damage reflected a form of "contamination" which was expressly excluded from coverage under the policy. Apart from the statements of government counsel made to this

63. Meanwhile, in mid–1986, the United States commenced the aforementioned "District Court case," No. S86–458, against the Debtors William and Terry to enforce the federal tax liens for Dr. Walters' tax liabilities against the 104 Valentine property and, upon learning of the asbestos problem, claimed a right to the proceeds of the asbestos claim to the extent allocable to the dwelling. Dr. Walters intervened and, on August 30, 1988 the District Court entered Judgment in favor of the United States and Dr. Walters against the Debtor William in the amount of $120,000 based upon a Settlement Agreement. (The ORDER RE CLAIM entered in the main case on October 5, 1993, directed the Clerk to attach the Judgment and Settlement Agreement to Claim S–1.) The Judgment reflects that Dr. Walters and the United States were then litigating the amount of Dr. Walters' liabilities in the District of Hawaii. Dr. Walters and the United States subsequently reached a settlement. (Testimony of Dr. Walters.)

64. The Settlement Agreement further provided for a partial assignment to the United States of any recovery by the Debtor Terry in the asbestos case and for the United States to have the right to sell the 104 Valentine Court property some time after the insurance case was concluded, with the Walters having possession in the meantime (with extensive provisions to guard against waste). The sale provision in favor of the United States was expressly preserved in the event of the Walters' bankruptcy, thus giving the United States a secured claim. (See ¶ 11 of the Settlement Agreement.)

65. During the District Court case, the Walters never claimed that Dr. Walters transferred 104 Valentine Court to them by gift and never mentioned the October 25, 1982 gift document discussed below (Exh. R–4). The basis of their defense to the Government action was the March 25, 1981 contract referred to in paragraph 11 above (Exh. S–1), in respect to which they maintained they had paid $20,000 by check dated August 3, 1983. (Exh. aO at pp. 62–66. See also Exh.

aP at 24, 89; aQ at 123–24 and exh. 4 thereto.)

66. For a time during the District Court case, the Debtor William claimed to have paid fully for 104 Valentine Court with gold coins. In this connection, he had caused to be prepared and executed by Dr. Walters a false receipt for gold coins at the time that he gave Dr. Walters the 17 additional coins on April 7, 1986. (Exhs. S–7, aO at pp. 66–69.) After producing this receipt as a defense to the Government's claims against the real property, the Debtor William admitted in his 1987 deposition that he obtained the receipt when returning Dr. Walters' own coins to Dr. Walters. (Id. at 66 ("I gave him gold coins back that were his. And he signed that receipt").)

67. On January 16, 1987, the United States served a request for production of documents in the District Court case, calling for, among other things, all documents relating to any transfer of any gold or silver coins from the Debtor William to Dr. Walters. (Exh. Z–5.) Although the Debtors William and Terry's response states that all responsive documents were produced (Id.), counsel for the United States represented in open Court, during the trial on February 23, 1994, that no coin-related documents were produced except for the false receipt just described (Exh. S–7). The Court finds that the Debtor William intentionally withheld documents.

68. The United States took the Debtors William's and Terry's depositions in the District Court case on March 9, 1987. (Exhs. aO, aP.) Among other things, the Debtor William asserted a Fifth Amendment privilege against self incrimination in respect to whether the letter associated with the 1983 income tax return (see ¶ 56 above), claiming an error on the return due to his having merely cashed checks for his father, referred to the "entire amount" originally reported as income from these transactions. (Exh. aO at 58–59.) He also asserted a Fifth Amendment privilege regarding whether he used the power of attorney from Dr. Walters after

effect during the trial on February 2–3, 1994, the insurance settlement occurred in a second District Court action—No. S86–310—the file from

which is subject to judicial notice by this Bankruptcy Court, as a unit of the District Court.

it was orally revoked (*Id.* at 139). Several answers the Debtor William did give during this deposition, apart from those already referred to above, are noteworthy as indicated in the following paragraphs.

69. Asked about assets from which Dr. Walters' tax liability might be collected, the Debtor William referred to the coin collection:

A. There was a substantial coin collection.

Q. That belonged to your father?

A. Right. "Well I knew about it because I had it in my possession. And he came and picked it up."

(*Id.* at 45.) The Debtor William then clarified that Dr. Walters' attorney, Don Clark, picked it up.

70. At the deposition, the Debtor William stated that he personally prepared the Walters' 1984 joint tax return as well as his individual 1985 tax return. (*Id.* at 18.)

71. At the deposition, the Debtor William stated that, when Dr. Walters was about to have surgery in 1984, he made a gift of two very valuable rings and two very valuable watches (which were listed on a personal articles floater endorsement to the Debtor Terry's hazard insurance policy at 104 Valentine Court). (*Id.* at 145–47, and exhibit 11 thereto.) In fact, however, he never had this jewelry in his possession, as indicated not only by the testimony of Dr. Walters at the trial but also by the testimony of the Debtors William and Terry during discovery in these proceedings. (Exhs. aQ, aR, aU.) During a visit to Dr. Walters in the Cayman Islands at Christmas time in 1984, the Debtor Williams asked Dr. Walters if he could borrow a valuable ring. When Dr. Walters asked what for, the Debtor William said that he wanted to have it appraised and insured and, after returning to Dr. Walters, he would claim it was stolen and collect the insurance proceeds. Dr. Walters declined. (Testimony of Dr. Walters.)

72. At the deposition, the Debtor William falsely denied having a personal checking account in 1985 or a savings account into which any profits from commodities trades were deposited, and stated that any withdrawals made from his accounts at Lind–Waldock and/or Jack Carl Associates between 1982 and 1987 would have been deposited into his wife's checking account. (Exh. ao at 108, 114, 116–17.) It was only two weeks later on March 24, 1987, that the Debtor William testified in an unrelated proceeding that "Keliter Corporation" was just "a name" he used a personal checking and savings account at the Michigan City Catholic Federal Credit Union. (See ¶ 26 above, citing Exh. Z–1, at 36–40.)

73. Apart from the real property at 104 Valentine Court in Michigan City, the debtors' schedules of assets and liabilities, dated December 12, 1989, list only $11,114 in property consisting mostly of automobiles ($8,750) and minimal house furnishings. Exh. aE. The Debtor Terry confirmed the correctness of the schedule during her Rule 2004 examination in 1991. (Exh. aR at 10.)

74. The Debtors' statement of financial affairs states that they made no transfers of property in the year preceding their petition. (Exh. aE.)

75. Although the Settlement Agreement in the District Court case expressly provides that the Government's right to have the 104 Valentine property sold to satisfy the judgment would survive the Walters' bankruptcy, after filing their petition, the debtors soon filed motion to strip down the secured claim of the United States and Dr. Walters, pursuant to 11 U.S.C. § 506(d).[13] Contending that the asbestos contamination made the property worthless or nearly worthless, debtors suggested that they should be able to keep the property by paying a *de minimis* sum in respect to the secured claims against the property. (It is true that the strip-down motion was crafted by debtors' former attorney, Roger Farley. However, the debtors are held to know of motions made on their behalf and plainly must have endorsed this strategy.) During a status conference, the Trustee indicated that he was not abandon-

---

13. On March 5, 1990, the debtors filed two separate motions each entitled MOTION TO DETERMINE SECURED AND UNSECURED STATUS OF CLAIM—one addressed to the District Court settlement agreement and one addressed to a lien filed for their 1983 joint income tax liabilities.

ing the property, so that a strip down was inappropriate, even under the law as it then existed.[14]

76. When the 104 Valentine property was proposed to be sold by the Trustee, the Debtor William posted no trespassing signs and caused a fallacious federal land patent claim to be filed against the property with the LaPorte County Recorder on May 24, 1993, and delivered a copy to the Michigan City Police on May 29, 1993. (Exh. aT.) The document was given to the police apparently in an effort to justify the Debtor William's trespassing on the property. The Court was informed of this by the Trustee at a hearing and thereupon enjoined debtors from trespassing or filing any further cloud on title. (MEMORANDUM OPINION AND ORDER entered June 14, 1993, and JUDGMENT Of June 15, 1993.)

77. By letter dated November 30, 1993, to the Hon. Robert L. Miller of the District Court, the debtors submitted affidavits purporting to "revoke, abjure, absolve, annul, void and make of no effect all signatures . . . on all documents filed in Civil Case Number S86–00458," including specifically the August 30, 1988 Judgment. A copy of said letter and affidavits was sent to this Court by cover letter also dated November 30, 1993.

78. During discovery in these proceedings, the Debtor William produced a document, referred to herein as "the gift document," that is the pinnacle of his defense both to the claims of Dr. Walters in No. 90–6030 and to the claims of the United States in the Tax Motion. The gift document is a preprinted "Contract" form, containing the following recital on its last page, in the handprinting of the Debtor William (irregular letter cases corrected):

I William H. Walters give to my son William G. Walters, on this date Oct 25, 1982 the following:

All coins, bullion and currencies in my personal collection.

All stocks, bonds, notes, trusts, checks and securities which I entrust to him.

The Real Estate commonly known as 104 Valentine Court in Michigan City, Indiana.

Any personal effects including jewelry, which he so desires.

There follows some pre-printed contract language after which the signature of William H. Walters appears under "FIRST PARTY" (with SECOND PARTY not completed, consistent with the unilateral nature of the instrument). (Exh. R–4.)

79. Although the 104 Valentine Court property is included in the purported gift, the gift document was not produced during discovery in the District Court action. Also, the Debtor William's testimony in the 1987 deposition indicated he acknowledged to having had only temporary "possession" of a coin collection belonging to his father. (See ¶ 69 above.) However, the Debtor William did produce the gift document to an IRS investigator during a criminal investigation respecting his 1984–86 tax returns. (Exh. W–2.)

80. By letter dated December 13, 1993, to this Court, the Debtor William transmitted affidavits by David F. Black and David Matthews both dated December 13, 1993, and both stating in identical terms that each "was present with the Debtor William G. Walters, William H. Walters, and [the other affiant] on October 25, 1982, and witness to the fact that William H. Walters signed the accompanying gift document." The affidavits are, of course, inadmissible hearsay—the Debtor William could have called the affiants as witnesses to testify at trial, subject to cross-examination.

81. Even if the Court were to admit the affidavits, it would reject the testimony therein as not credible in light of all the evidence which contradicts the gift document as described in the following paragraphs.

82. First, the inclusion of the 104 Valentine property cannot be reconciled with the Debtor William's prior statements and con-

<hr>

14. Since then, the Supreme Court has ruled that § 506(d) does not permit a Chapter 7 Debtor to "strip down" a creditor's lien on real property to the judicial determined value of the collateral, where the creditors' claims were secured by a lien and had been fully allowed. *Dewsnup v. Timm*, 502 U.S. 410, 417–18, 112 S.Ct. 773, 778, 116 L.Ed.2d 903 (1992).

tentions. He produced and relied upon the 3/25/81 contract for the purchase of the 104 Valentine property after the date of the purported gift. He paid $20,000 toward that purchase price in 1983 after the purported gift in 1982 (or at least claimed in 1987 to have made such a payment). (See ¶ 65 above.) The Debtors William and Terry's 1983 income tax return, signed in 1985 and filed in 1986, includes a "Form 2119 (Sales or Exchange of Principal Residence)" on which the Debtors William and Terry claim to roll over the gain from the sale of a prior residence (at 306 Lawndale Place in Michigan City, Indiana, as indicated in the 1987 deposition in the District Court case) in light of the greater "cost" of 104 Valentine Court, specified as $140,000. This contradicts any suggestion that 104 Valentine Court was, at the time the return was signed on March 18, 1985, considered to have been a gift.

83. The inclusion of all stocks, bonds, notes, and currencies in the gift document is also contradicted by the record. As noted above (9 62) the Debtor William advised his own accountant in writing on March 14, 1985, that funds that were paid to Dr. Walters belonged to Dr. Walters. (Exh. R–1a.) As also noted above (¶ 56), the Debtor William wrote to the IRS on 5/20/86 to claim the money he reported on the 1983 income tax return "was never mine" and was merely laundered for his father and then returned to him. The letter does not contend that any of the funds were a gift, which of course would have been a defense to the 1983 tax assessment as well. (Exh. V–2 (documents associated with tax return).)

84. With respect to the coins, the gift document cannot be reconciled with the Debtor William's having signed the 12/4/85 handwritten coin inventory (¶ 39) acknowledging he was returning "property of William H. Walters to his attorney Donald O. Clark." There also is no dispute over the fact that Dr. Walters kept his coin collection in Hawaii until shortly before his surgery in 1984. The Debtor William's Rule 2004 examination and deposition testimony agrees with Dr. Walters' testimony on this point. There was plainly no delivery at the time of the gift document.

85. The gift document cannot be reconciled with the 4/7/86 agreement by the Debtor William to pay $300,000 to Dr. Walters "for items which I took." See ¶ 45 above.

86. Dr. Walters testified that, based upon a review of his own cancelled checks, he is certain that he was in Hawaii on October 25, 1982. The Debtor William, in his 1987 deposition in the District Court case, testified that he visited Dr. Walters in Hawaii at Christmas–New Year's time in 1982/83 and not the preceding October (and there is no evidence that either David F. Black or David Matthews went to Hawaii in October of 1982). It is also not credible that, suddenly in late 1993, the Debtor William recalled that his two friends witnessed Dr. Walters sign the document on October 25, 1982, considering that, during his Rule 2004 examination on May 5, 1991, and again at his deposition on July 14, 1992, the Debtor William could not even remember if the document was signed in Hawaii or Indiana. (Exhs. aQ at 75; aU at 52–54.) It is not credible that the Debtor William would forget what state he was in when his father gave him over $500,000 worth of property. Also, when the Debtor William was asked if he was there when his father signed the document and affirmed that he was, he neglected to mention that David F. Black and David Matthews were also there. (*Id.*) The Court finds it implausible that he would not have disclosed such sources of corroboration for his primary defense earlier were it in fact true that the affiants witnessed the signing.

87. In September of 1982, Dr. Walters amended an instrument which provided for the disposition of his property upon his death, and specified that it be divided among his wife and all his children. (Exh. aF.) It is not likely he would do this and then suddenly, a month later, give virtually everything he owned to the Debtor William.

88. Dr. Walters testified that the signature on the gift document appeared to be his, but he vigorously denied ever knowingly signing a document that would effect a gift to the Debtor William of the property specified on the gift document. He suggested that he may have signed the form in blank, as a proposed duplicate of the 3/25/81 contract for

the sale of 104 Valentine Court, after which the Debtor William may have filled in the operative language. (Testimony of Dr. Walters.) In this regard, the Court further notes that the October 22, 1982 gift document and the March 25, 1981 contract for the sale of the 104 Valentine property (referred to in paragraph 3 above) are both on form "M 155—Blank contract plain English format: 11–78" published by Julius Blumberg, Inc. The originals, which were shown to the Court at trial, each consist of a single folded document that is 81/2 by 28 inches when unfolded and is folded at the top so as to reflect four page-faces of 81/2 by 14 inches. The gift document adds nothing to the pre-printed contract form on the first three page-faces, and contains the operative recital in the Debtor William's handprinting on the signature page as noted above. In contrast, there is no operative language on the signature page of the 3/25/81 contract respecting Valentine Court, on which the operative terms are instead filled in on the first page (again in the Debtor William's hand-printing).

89. The Debtor William is plainly not above creating false documents to support a fraudulent defense to a valid claim as shown by his initial production in the District Court action of the false receipt for coins given in payment for the 104 Valentine Court property which he ultimately conceded was fabricated. (See ¶ 66 above.)

90. The Court finds that Dr. Walters signed the gift document either in blank form or otherwise without examining its contents and without intent to make a gift of the property described thereon. Further, there was plainly no delivery required to effectuate a unilateral gift and the behavior of both Dr. Walters and the Debtor William after the date of the gift document, as described above, is wholly inconsistent with any assumption on the part of either of them that a gift had really been effected.

91. Many of the coins missing from Dr. Walters collection (see Exh. aA–3) remain unaccounted for.

92. Dr. Walters testified to having had a particularly valuable "high relief" 1907 St. Gauden's $20 gold piece purchased long ago and now worth over $100,000. As early as his 1987 deposition, the Debtor William appeared to be pointedly aware of the existence of this particular coin, referring spontaneously to its having been among the coins returned to attorney Donald Clark on December 4, 1985. (Exh. aO at p. 48.) In his Rule 2004 examination, after it was learned that Dr. Walters claimed many coins, including this one, had not been returned, the Debtor William more specifically testified that "the best coins of his collection" were listed only as part of a miscellaneous book with slots for coins, which he claimed contained 60 coins. (Exh. aQ at pp. 56–57. See also Dr. Walters Exh. 1 at p. 56.) When shown the handwritten inventory of coins being returned to Donald Clark on December 4, 1985, signed by himself, Mr. Clark, and attorney Atley Price (Exh. Aa–1), he said this referred to item 103 on the list. (Exh. Aq at 66–68 and exhibit 22 thereto.)

93. The Court finds that the 1907 St. Gauden's $20 gold piece was not returned on December 4, 1985. The handwritten list prepared at the time itself indicates, underneath item 103, that the book contained only 36 coins. Dr. Walters testified that extremely valuable coins are sealed in a special substance and not kept in a booklet where they are exposed to handling and the elements. The Debtor William acknowledged this himself during his Rule 2004 examination. (Exh. Aq at 68–69.)

94. The 1903 "commemorative" gold dollar valued at $13,000 by Coin Investors (see ¶ 47 above) also remains unaccounted for.

95. On October 29, 1993, the Debtor Terry signed a Uniform Residential Loan Application, which not only listed her as the owner of 106 Barker Road in Michigan City (as discussed further below) but also indicated her assets as including $63,000 worth of personal property other than automobiles (listed separately). (Exh. Am.) Given that the debtors have three children, it is difficult to imagine the Debtor Terry accumulating this much personal property on her nurse's salary since the petition date.[15] Rather, this ap-

15. The Debtor Terry testified in her Rule 2004 examination (on May 2, 1991) to having earned

pears to corroborate the debtors' retention of much of the personalty involved in the asbestos claim, albeit at a more realistic valuation.

96. When asked at her Rule 2004 examination what had become of all the property on the asbestos claim, the Debtor Terry, incredibly, answered multiple times that she could not remember. (Exh. aR at p. 11.) Nonetheless, she also testified that when the Walters moved out of the 104 Valentine property to their next residence at Birch Tree Farms townhouses in Michigan City (*Id.* at p. 12), they left no significant furniture behind and that "[w]e took everything with us." (*Id.* at p. 25.) When they moved to their next residence at 7709 Wallace Street in Merrillville (their address on the bankruptcy petition), they again took all the furniture, storing some of it in the garage. (*Id.* at 25–26.) Finally, when moving from there to 106 Barker Road in Michigan City, they still kept all the furniture, again storing some of it in the garage. (p. 26.) Yet, inexplicably, the Debtor Terry lost track of a $2,500 antique table they no longer had (p. 27), a curved desk (p. 29). Also, a 25"–screen TV was sold to a friend, Ron Smith, right before they moved to 106 Barker Road (pp. 34–35), and numerous other items were inexplicably no longer within the Debtor Terry's consciousness. She confirmed that they kept a $3,600 large screen Mitsubishi TV and a video recorder (p. 40). Significantly, while the Debtor Terry answered no to the question of whether the debtors had any further garage sales since 104 Valentine Court, the Debtor Terry answered simply "No" (p. 25). The Debtors had theretofore placed an advertisement with the Michigan City News–Dispatch, published the day of the Rule 2004 examination, for a garage sale to take place over the next couple of days.

97. When asked at her Rule 2004 examination where she currently had bank accounts, the Debtor Terry identified Gainer Bank in Hobart and First Federal of LaPorte County in Michigan City (referring to "First Federal Savings and Loan Association of LaPorte County," now known as Community Bank). She stated she had no accounts during the past ten years other than these two and the account at Lakeshore Bank. (Exh. aR at pp–48–49.) This left out First Federal Savings Bank of Indiana in Merrillville, where the Debtor Terry held a joint account with John Roszkowski, opened with an initial deposit by the Debtor Terry of $2,000 in "currency" on October 1, 1990. Apart from deposits made by John Roszkowski, there are additional deposits made by the Debtor Terry of $1,000 in currency on November 23, 1990; $5,547.19 by check (not further identified) on November 29, 1990; $4,010.47 by check (also not further identified) on November 30, 1990; a $1,457.29 check on December 15, 1990; and $2,326.16 from three checks on January 9, 1991. There was a balance of over $11,000 as of the date of the Rule 2004 examination on May 2, 1991. There are also substantial withdrawals or checks drawn by the Debtor Terry, including a $5,700 withdrawal on January 21, 1991. (Exh. J.). Significantly, that $5,700 withdrawal was in the form of a money order which was then deposited into the Debtor Terry's checking account at First Federal Savings and Loan Assoc. of LaPorte County in Michigan City. (Exh. E.) Two and a half months later, she deliberately omitted disclosure of the existence of the savings account in Merrillville.

98. Prior to executing the 1984, 1985, and 1986 returns, the Debtor William had become a commodities trading adviser, and was thus knowledgeable in matters of investment and profit.

99. When executing the 1984 and 1985 (in 1986), and the 1986 returns (in 1987), the Debtor William knew, based upon the advice previously given by his accountant (John Angelos) with respect to the 1983 return, of the requirement to report as income amounts received from and not returned to Dr. Walters. (Exh. R–1.)[16] The Debtor William

gross wages of between $28,000 and $42,000 per year over the past two years. (Exh. aR a p. 15–16.)

16. The inference can be made from the surrounding facts that accountant John Angelos, as well as William's attorney Atley Price (whom Angelos' memo to the file identifies as participating), were frankly told by William that the portion of the funds kept by William in 1983 were misappropriated. It is simply not plausible to

could not have forgotten this advice as he referred to it in his 5/20/86 letter to the IRS, associated with the 1983 tax return. (See Finding 64 above.) Most significantly, this letter to the IRS was written only three days before the Debtor William signed the 1984 and 1985 returns.

100. The Debtor William's 3/14/85 letter to his accountant also demonstrates an understanding of applicable tax principles. (Exh. R–1a.)

101. On May 7, 1987, the Michigan City News Dispatch published a letter to the editor from the Debtor William ("Bill Walters"), sarcastically applauding the charges brought against Carl Channell for using the tax exempt status of the National Endowment for the Preservation of Liberty to allow donors to claim deductions for funneling money to the contras. The letter concludes:

I have the greatest praise for Channell/North and others like them; and for those of you who are so fearful of the system, I ask you to please turn my name into the Internal Revenue Service. I'd love for them to audit me.

(Exh. Y–6.) Further, Penelope Ropar, who testified to saving this newspaper excerpt, also testified that her brother the Debtor William often told her and other family members at family gatherings that she and they were "stupid" for paying taxes.

102. Sometime in 1988, the IRS began a criminal investigation respecting the debtors' tax liabilities. Criminal charges ul-timately were never pursued but the investigation led ultimately to the issuance on May 4, 1992, of the statutory notices of deficiency attached to the Tax Motion. It is observed that these deficiency notices were issued both after the Debtors filed their Petition, and after they received their Chapter 7 Discharge on May 10, 1990. The Debtors filed a petition with the United States Tax Court to redetermine the deficiencies pursuant to 26 U.S.C. § 6213, but filed it late, and the Tax Court therefore dismissed the case on October 21, 1992. (Exh. V–11.) In the meantime, as noted above, on June 19, 1992, the United States filed the Tax Motion before this Court.[17]

103. The deficiency notice for 1984 asserts unpaid tax owed by the Debtors William and Terry in the amount of $10,656, a civil fraud penalty against the Debtor William only of $5,328 (50% of tax), and a substantial understatement penalty against both the Debtors William and Terry of $2,664 (25% of tax), with interest and an additional civil fraud penalty (against the Debtor William only) equal to 50% of the interest on the tax to be computed. It includes the following express reservation:

Dr. William H. Walters ... has filed an adversary proceeding in the chapter 7 bankruptcy case asking that judgment be rendered in the amount of $805,000 and that the judgment be determined to be nondischargeable. Since the complaint alleged that the Debtor William G. Walters

---

imagine that an accountant would insist upon including a "gift" in income; nor is it plausible to imagine an attorney not questioning such advice if it had been given in the attorney's presence. Indeed, it is hard to imagine why William had an attorney accompany him to meet with his accountant, other than due to the sensitive nature of the admissions William was making. William's letter to the accountant after the meeting, moreover, does not give any indication of there having been any gift. Similarly, it is almost inconceivable to imagine attorney Price allowing William to sign the 12/4/85 coin inventory stating he was returning property "of William H. Walters" if William had previously told Price the coins were a gift. (See ¶ 39 above.)

**17.** The Tax Court and Bankruptcy Court have concurrent jurisdiction to determine tax liabilities. *United States v. Wilson,* 974 F.2d 514, 518

(4th Cir.1992). Pursuant to § 362(a)(8) the automatic stay precludes the commencement or continuation of a proceeding before the United States Tax Court, unless the bankruptcy court lifts the stay to allow it. Section 362(a)(6) stays the assessment of a claim that arose prior to the commencement of the case; however, pursuant to § 362(b)(9), the automatic stay does not operate as a stay of the issuance to the Debtor by governmental unit of a notice of a tax deficiency. *In re Ungar,* 104 B.R. 517, 520 (Bankr.N.D.Ga. 1989). In addition, the stay had been dissolved by the grant of the Debtors' discharge pursuant to § 362(c)(2)(C), because the acts of the IRS did not relate to property of the Debtors' estate under § 362(c)(1). However, even when the stay is lifted, the Bankruptcy Court retains jurisdiction concurrent with the tax court. *U.S. v. Wilson,* 974 F.2d at 518, *supra.*

converted or otherwise misappropriated the property of Dr. William H. Walters, to the extent that the bankruptcy court grants judgment against the Debtor William G. Walters, the government will pursue an increased deficiency for those amounts of income greater than those listed in the statutory notice of deficiency. (Attachment to Tax Motion filed 6/19/92, at tenth page.) [18]

104. The deficiency notice for 1985 and 1986 asserts unpaid tax (owed by the Debtor William only) in the amounts of $19,697 and $7,121 respectively, civil fraud penalties of $9,849 (50% of tax) and $5,341 (75% of tax) respectively, and substantial understatement penalties of $4,924 and $1,780 respectively (25% of tax), with interest and additional civil fraud penalties equal to 50% of the interest on the tax to be computed. It includes a reservation identical to the 1984 notice.

105. The Tax Motion similarly reserves the right to assert additional income depending upon the outcome of No. 90–6030, and further specifies that the embezzlement of the coins took place in 1984 such that the proceeds from liquidation of coins included in income in 1985 and 1986 should instead be included in 1984 along with the entire portion of the coin collection that remains missing. (Tax Motion at ¶¶ 8, 13.)

106. On February 23, 1993, a delegate of the Secretary of the Treasury made assessments against the Debtors William and Terry for 1984 joint income tax liabilities and against the Debtor William for 1985 and 1986 income tax liabilities, consistent with the figures in the deficiency notices as set forth above, except for insignificant discrepancies. The two fraud penalties for each year (i.e., 50% or 75% of the tax and 50% of the interest) are assessed as a single amount for each year. (Exh. V–12a (Certificates of Assessments and Payments).)

107. Schedule B–3 indicates the Debtors leased 104 Valentine Court to Leon Zolkowski in June of 1989. The Debtor Terry testified that the house was vacated by the Wal-

ters about a month prior to Zolkowski moving in. (Exh. aR at 43–44.) The Debtors William and Terry both testified that a number of items were sold when or after they moved out of 104 Valentine Court—i.e., within one year before their bankruptcy petition was filed—including a washer and dryer, computer, possibly a piano (the date is uncertain), an antique desk, and smaller items at a garage sale held some time after moving out of 104 Valentine. (See generally Exhs. aQ and aR.)

*SUPPLEMENTAL FINDINGS OF FACT RELATING TO COUNT I OF THE SUPPLEMENTAL COMPLAINT BY THE UNITED STATES TO REVOKE THE DISCHARGE OF THE DEBTORS WILLIAM G. WALTERS AND TERRY G. WALTERS IN ADVERSARY PROCEEDING NO. 91–6073*

S1. On May 21, 1991, before the adversary proceedings were consolidated, Dr. Walters served a REQUEST FOR PRODUCTION OF DOCUMENTS on the Debtor William in No. 90–6030. On May 24, 1991, counsel for Dr. Walters deposed the Debtor William who, after stating that he had records both within and outside the State of Indiana, refused to reveal either location. (Dr. Walters Exh. 1 at 38–39.) On July 9, 1991, Dr. Walters served a motion to compel, alleging that the Debtor William wholly failed to respond to the request for production. By ORDER entered July 31, 1991, the Debtor William was given until August 14, 1991, to respond to the production request. At the August 15, 1991 status conference in the consolidated proceedings, the Court was informed that the Debtor William had still not responded. It then ordered sanctions, confirmed by ORDER entered August 20, 1991, precluding use of any responsive documents at trial.

S2. On September 19, 1991, the United States served a REQUEST FOR PRODUCTION AND NOTICE OF DEPOSITION on the debtors' former attorney ("Request/Notice"). The time in which to produce the

---

18. Section 6214(a) of the Internal Revenue Code (26 U.S.C.) provides that the Tax Court has jurisdiction to redetermine the correct amount of the deficiency asserted in the notice "and to determine whether any additional amount, or addition to the tax should be assessed, if claim therefor is asserted by the Secretary at or before the hearing or a rehearing."

documents was then extended by the AGREED ORDER EXTENDING DISCOVERY entered on October 30, 1991 (which extended the deadline for discovery by the United States only in light of the debtors' failure to comply). On October 28, 1991, the Debtor William G. Walters appeared in connection with the request for production and produced some documents selectively culled from the debtors' records and otherwise generally failed to comply. As non-compliance was apparent, debtors' former attorney, Roger Farley, in the presence of the Debtor William and with his concurrence, agreed that the Debtors would produce additional documents by mail and this agreement was reduced to writing by a letter dated October 29, 1991. (A copy of the October 29, 1991 letter is attached to the November 25, 1991 ORDER COMPELLING DISCOVERY.) The debtors then failed to produce the documents to their own attorney for transmittal in accordance with the agreement. On November 25, 1991, the Court entered an ORDER COMPELLING DISCOVERY within 10 days.

S3. Debtors' former counsel then moved to withdraw and the Debtor William purported to comply with the order by delivering a box of documents to the Trustee who, after seeking instructions from the Court and concurrent with the order permitting debtors' former counsel to withdraw, was directed to send the documents to Government counsel. (ORDER Of January 23, 1992.)

S4. In accordance with the January 23, 1992 ORDER, the United States filed its REPORT ON DOCUMENT PRODUCTION AND ON THE STATUS OF DISCOVERY GENERALLY on April 30, 1992. The report amply demonstrated that debtors' production was not complete. For example (and not intended as exhaustive), the Debtor William had previously testified during his Rule 2004 examination that he had saved all personal letters from Dr. Walters, yet he produced nothing beyond the incomplete pages he had determined to show Government counsel at the Rule 2004 examination.

S5. The Government's report indicated it would await the Debtor William's deposition before determining what sanctions to seek (suggesting he might purge his contempt). The transcript of the Debtor William's deposition on July 14, 1992, demonstrates that he then produced additional records, but also demonstrates that he knew of other records he still had in places he had not yet bothered to search. (Exh. aQ at 34–37.)

S6. At a status conference on July 28, 1992, counsel for the United States stated that the debtors had still not produced all of the required documents. The Debtor William did not deny this statement (and the Debtor Terry had failed to appear). Consistent with representations made in the Government report regarding discovery compliance, counsel moved for an order precluding debtors from using at trial any documents they failed to produce except documents mailed to counsel and the Court forthwith. The Court indicated it would grant the motion. The Debtor William then mailed a stack of documents numbered 1 through 51 under a cover letter dated July 28, 1992, and filed on August 3, 1992. On October 7, 1992, the Court entered its ORDER PRECLUDING DEBTORS FROM INTRODUCING DOCUMENTS NOT PRODUCED DURING DISCOVERY.

S7. When the Debtor William filed proposed supplemental exhibits with his AMENDED PRETRIAL PAPERS on October 22, 1993, proposed exhibits 62, 64, 68, 69, and 71 reflected documents responsive to the Governments' discovery requests and the ORDER COMPELLING DISCOVERY and not previously produced. (The Government's objections to certain of the supplemental exhibits so indicated, and the Debtor William did not respond or otherwise deny the contentions.)

S8. On October 1, 1992, this Court entered an ORDER REQUIRING DEBTORS To FILE RESPONSES TO U.S. TAX MOTION, which called for particularized and separate responses by each Debtor and specified that any defenses not asserted would be deemed waived and any facts not denied would be deemed admitted. The only response of the Debtors to the Tax Motion was a brief statement on page 6 of their joint RESPONSE TO MEMORANDUM OPINION AND ORDER, attached to a NOTICE

OF APPEAL, filed January 15, 1993, referring to this Court's MEMORANDUM OPINION AND ORDER Of January 4, 1993. (The order appealed from had denied the Debtors' motion to dismiss and the appeal was dismissed as premature.) The language responding to the Tax Motion, which did not comply with the October 1, 1992 order, consisted of the following:

IN DIRECT RESPONSE TO USA's § 505 MOTION: We object to each and every charge in adversary 91–6073 and 90–6030. Everything I received from William H. Walters is a gift.

S9. Also on October 1, 1992, the Court entered an ORDER REQUIRING DEBTORS TO PARTICIPATE INDIVIDUALLY UNLESS COUNSEL IS RETAINED. The order was issued because, after the withdrawal of Debtors' former counsel, the Debtor Terry had failed to participate in telephonic conferences and the Debtor William had attempted to represent her but had been told he could not. The order specified, in pertinent part (emphasis added):

ORDERED that the debtors, while representing themselves, shall each individually participate in all further proceedings before the Court, including all pretrial conferences and hearings. This specifically includes the telephonic status conference set for October 7, 1992. . . . Failure to participate in further proceedings (absent an appropriate motion and showing of a need for relief) will constitute grounds for the entry of a default judgment and/or such other sanctions as appear just and proper.

S10. The October 7, 1992 conference referred to in the order was held as indicated and the Debtor Terry failed to appear without having made any motion. (This failure is noted in the Court's Order entered on October 7, 1992.) The Debtor Terry has since failed to appear at every telephonic conference save one while an advance indication that she could not attend was indicated only once by her filing of November 2, 1992, stating that she could not appear at the November 3, 1992 conference.

S11. The Debtor Terry did attend one hearing in the courtroom. The hearing was in respect to the debtors' motion to recuse the presiding Judge, held April 9, 1993. After the Court denied the motion, both debtors filed a MOTION TO VITIATE DECISION NOT TO RECUSE on April 22, 1993.

S12. By order of April 23, 1993, the Court, on its own motion, set this motion for hearing on June 9, 1993, along with hearing for the Debtors to show cause why they should not be sanctioned. The Debtor Terry failed to appear at her own sanctions hearing on June 9, 1993.

S13. By MEMORANDUM OPINION AND ORDER Of June 14, 1993, the Court ordered the Debtors to pay certain monetary sanctions to the court, the Trustee, counsel for Dr. Walters, and counsel for the Government. The fine to the Court has not been paid (and the Court was advised in chambers immediately prior to the trial on February 2–3, 1994, that no payments had been made to counsel). On June 28, 1993, Debtors jointly filed a letter stating they are unable to pay the sanctions. However, the Debtor Terry is gainfully employed as a nurse and, as noted below, in October of 1993, she received $37,071 in net proceeds from the sale of the property at 106 Barker Road in Michigan City, Indiana. Court finds that she had the ability to pay the sanctions and has contumaciously refused to do so.

S13. The Debtor Terry failed to appear at the final pretrial conference held at the courthouse on September 20, 1993, pursuant to paragraph 5 of the ORDER entered on July 5, 1993.

S14. Both Debtors failed to appear at a telephonic hearing on December 7, 1993. (This failure is noted in the ORDER entered on December 8, 1993.)

S15. Both debtors failed to appear at the commencement of the trial on February 2, 1994. As attested by counsel for the United States, Peter Sklarew, at that time, he contacted chambers on January 31, 1994, to request that the trial commence at 10:30 a.m. to permit time for him to fly to Chicago on the morning of February 2nd, rather than travel the preceding night. He called the Walters' residence on the evening of January 31st and spoke to their daughter who imme-

diately conveyed to the Debtor William, who was heard in the background conversing with said daughter, that the time for the commencement of the trial previously set for February 2, 1994, was 10:30 a.m. After the Debtor William's daughter called out Government counsel's message, the phone was hung up at the Walters' end. Government counsel then reached the Debtor Terry Walters at work, reminded her of the trial date, and notified her that the trial would commence at 10:30 a.m. She indicated she would not be attending and counsel warned that he would move to default her. She was then asked to reconfirm the same message to her husband.

S16. Further, at the direction of the Court, secretary Nancy Tuerff made several attempts to reach the Debtors on the morning and early afternoon of February 2, 1994. Several messages were left on a message device at the Walters' residence (219–926–7267) and the taped message played to callers was changed from a male voice to a female voice between two of the calls, indicating the Debtor Terry had changed the message, and thus had been there or had at least called in for messages. Attempts were also made to reach the Debtor Terry at her place of employment at St. Mary's Hospital in Hobart, Indiana, using the number of the intensive care unit (219–947–6885) at which Mr. Sklarew had reached her on the evening of January 31, 1994. (Testimony of Nancy Tuerff.) No calls from either of the Walters were received in chambers that entire day or the next day.

■ S17. The Court finds that the Walters contumaciously refused to attend the trial in violation of the October 1, 1992 order requiring them to participate in all court proceedings. In addition to the foregoing, the Court bases this finding on affidavits sent by the Debtors to the Court dated January 9, 1994, stating that they each "revoke all my signatures pertaining to bankruptcy case number 89–62082 and adversary number 91–6073 because of fraud committed by the IRS and the United States Department of Justice."

■ S18. The Debtor William has consistently asserted frivolous tax protester arguments in motions and other papers filed with the Court in these proceedings. Many of these arguments are addressed in prior Court opinions and orders in these cases and in Adversary No. 93–6137. While the Debtor William's contentions are generally not wholly repetitive, they nevertheless plainly reflect minor variations on a theme the essence of which is that the IRS lacks authority to assess or collect taxes from him or that the Government otherwise lacks standing in these proceedings. The number of times that the Debtor William has advanced variations on this theme despite Court warnings and sanctions rises to the level of contumacious conduct.

S19. Finally, the Court finds that, beyond the inconsistencies in their prior testimony as referred to above, both Debtors have deliberately given false testimony under oath in the presence of the Court. This occurred during the April 9, 1993 hearing on the motion to recuse. The Debtor William testified that he rented the property where he lived a 106 Barker Road in Michigan City from David Black. (Exh- aJ at pp. 5–6.) The Debtor Terry, in turn, similarly testified that she pays rent to David Black, and that he is her "landlord." (Id. at 12–13.) The Court finds that the Debtors, or at least the Debtor Terry, actually owned an equitable interest in the property as reflected by their/her execution of multiple documents as "owner,—or as—seller" when the property was sold, and as further evidenced by the disbursement of $37,071.02 in net sale proceeds to her when the property was sold on October 15, 1993. (Exh. aI, aK, aL.) By letter dated December 22, 1993, to this Court, in response to the Government's prior allegation (made in the motion to dismiss No. 93–6137 and for sanctions) that this testimony was false, the Debtor William attempted to explain this testimony:

> My wife did not own the property at that time of April 4, 1993. And it is my understanding that in a land contract, one rents to own and does not own until payment in full is made. It is with this understanding that I used the term "rent."

The Court does not credit this explanation in light of the documents referred to above. (Exhs. aI. aK, aL, aM.) Some of the docu-

ments executed identify the Debtor William or the Debtor Terry simply as "owner." Also, throughout the District Court case, the Debtors William and Terry maintained that they owned the 104 Valentine Court property by reference to the 3/25/81 contract to buy it for $140,000 on which they maintained they had paid only $20,000.

S20. There is nothing in the record to enable the Court to determine whether the Debtors' equity in the 106 Barker Road property is traceable to concealed prepetition assets and the Debtors may have had an alternative motive for testifying falsely with respect to their interest in the property given that the IRS had already assessed and issued notice and demand for payment of the 1984–86 tax liabilities at issue on February 23, 1993, thus giving rise to a federal tax lien on post-petition assets as well. (Exh. V–12a.) Nevertheless, the Debtors' readiness to lie in the face of the Court is further evidence of their contempt for these proceedings. (The Debtor Terry's residential loan application, signed on October 29, 1993, also certifies that she was not then a party to a lawsuit, despite the pendency of these proceedings. Exh. aM.)

S21. Any statement set forth as a conclusion of law below that is more properly characterized as a finding of fact constitutes an additional finding of fact.

### III

### Consolidated Conclusions of law and Discussion

### A.

**Conclusions of Law and Discussion as to § 505 Tax Motion by United States filed in Debtors' Main Case 89–62082**

1. The Court concludes that it has subject matter jurisdiction over this Contested Matter pursuant to 28 U.S.C. § 1334, and it is a core proceeding under 28 U.S.C. § 157(b)(2). This is the case even though no express reference to § 505 is found in 28 U.S.C. § 157(b)(2). The list of matters set out in 28 U.S.C. § 157(b)(2) is not exclusive based on the definition of the word "include" as not being limiting. 11 U.S.C. § 102(3) In addition, Section 157(b)(2)(A) of title 28 pro-

vides generally that core proceedings include matters concerning the administration of the estate, while § 157(b)(2)(O) states that core proceedings include other proceedings effecting the adjustment of the debtor-creditor relationship. Section 505 involves a substantive right provided by title 11, and it is a proceeding that, by its nature, could only arise in the context of a bankruptcy case, and thus this proceeding is a core proceeding. *Diamond Mortgage Corp. v. Sugar*, 913 F.2d 1233, 1239 (7th Cir.1990). *See also, U.S. v. Wilson*, 974 F.2d 514, 517 (4th Cir.1992); *In re AWB Associates, G.P.*, 144 B.R. 270, 275 (Bankr.E.D.Pa.1992); *In re Hunt*, 95 B.R. 442, 444 (Bankr.N.D.Tex.1989); *In re Fairchild Aircraft Corp.*, 124 B.R. 488, 491 (Bankr.W.D.Tex.1991).

2. The Court's jurisdiction is concurrent with the U.S. Tax Court. *See*, Discussion at footnote 17, *supra*. The Debtors filed a petition therewith to redetermine the deficiencies (the automatic stay having been dissolved by the entry of their discharges). Had the Tax Court petition been timely, this Court might have abstained. The Debtors contention that their Tax Court petition was timely must be rejected on grounds of *res judicata*, since they did not appeal the Tax Court's dismissal order. The Debtors' purported withdrawals of their signatures on their bankruptcy petitions are without legal effect. Having invoked the jurisdiction of this Court to obtain the protections afforded by the Bankruptcy Code, and having effected the automatic stay, the Debtors cannot deprive this Court of jurisdiction simply by unilaterally determining that they would like the proceedings against them to cease. See 11 U.S.C. § 707 relating to the dismissal of chapter 7 cases.

3. The initial question is the effect of the correctness of the assessments and deficiency notices versus the Debtor by the IRS as to the ultimate burden of proof and the burden of going forward with the evidence in this § 505 contested matter initiated by the United States. This issue has perplexed the Courts and they have reached varying results. *Collier on Bankruptcy Taxation*,

¶ 5.03[5], pp. 19–22 (Sheinfeld, Witt, Hyman and King, 1993).

It should be noted that although the resolution of this contested matter may as a practical matter have the same effect as if the Court decided an objection by the Debtor to the Claim of the IRS, this contested matter does not arise under § 502(b), and Fed. R.Bk.P. 3007 relating to objection to claims, but under § 505(a). *See,* § 502(a) (Claim deemed allowed until objected to), and Fed. R.Bk.P. 3001(f) (properly filed claim is prima facie evidence of validity and amount of claim).

■■■ "In bankruptcy, it is settled that a properly executed proof of claim is sufficient to shift the burden of producing evidence *and* to entitle the claimant to a share in the distribution of the bankruptcy estate, unless the objector comes forward with evidence contradicting the claim." *In re Global Western Development Corp.,* 759 F.2d 724, 727 (9th Cir.1985), *quoting, In re Friedman,* 436 F.Supp. 234, 237 (D.Md.1977) (emphasis in original); *In the Matter of Fisher Holding Co., Inc.,* 12 B.R. 191, 192 (Bankr.S.D.Ind. 1981). Thus, even if a party objects to a claim the evidentiary effect of Bankr.R. 3001(f) as to the validity and amount of a claim remains in force. *In re Wells,* 51 B.R. 563, 566 (Bankr.D.Colo.1985). More than the mere interposition of an objection is required to overcome the prima facie validity of a claim. *In re Delta Smelting & Refining Alaska, Inc.,* 53 B.R. 877, 883 (Bankr.D.Alaska 1985). Once the objector has rebutted the claimant's prima facie case as to the validity or amount of claim, the claimant has the burden of proving his claim. *Fisher Holding Co.,* 12 B.R. at 192.

■■■ At the hearing on an objection to a proof of claim the burden of going forward with the evidence is on the objectant. *In re Vic Snyder, Inc.,* 50 B.R. 631, 633 (Bankr. E.D.Pa.1985).

■■■ However, the proof of claim, standing alone, is not sufficient when the objector comes forward with facts which by probative force are equal to that of the allegations of the claim itself, and in such case the prima facie presumption of validity is defeated, and it continues to be the claimant's burden to establish the validity and amount of the claim. *In re Simmons,* 765 F.2d 547, 552 (5th Cir.1985); *In re Hinkley,* 58 B.R. 339, 348 (Bankr.S.D.Tex.1986); *In re Wells,* 51 B.R. 563, 566 *supra; In re DeLorean Motor Co. Litigation,* 59 B.R. 329, 336–37 (Bankr. E.D.Mich.1986).

■■■ The standard of proof as to a Claimant, whose claim has been properly objected to is by a preponderance of the evidence once the objecting party overcomes the presumption of the validity of a claim by meeting its initial burden of persuasion. *In re Tidewater Memorial Hospital, Inc.,* 106 B.R. 885, 888 (Bankr.E.D.Va.1989); *In re Paige,* 106 B.R. 346, 349 (Bankr.D.Conn.1989); *In re Glenn,* 100 B.R. 763, 766 (Bankr.W.D.Pa. 1989); *In re Celona,* 90 B.R. 104, 109 (Bankr. E.D.Pa.1988); *In re Sinclair,* 92 B.R. 787, 788 (Bankr.S.D.Ill.1988); *In re Horizon Machine & Engineering Corp.,* 54 B.R. 669, 670 (Bankr.N.D.Ill.1985); *In re Kontaratos,* 35 B.R. 135, 139 (Bankr.D.Me.1983), *approved, cause remanded, U.S. v. Kontaratos,* 36 B.R. 928 (D.Me.1984); *In re Central Rubber Products, Inc.,* 31 B.R. 865, 867 (Bankr.D.Conn. 1983); *Matter of Anchorage Boat Sales, Inc.,* 29 B.R. 275, 277 (Bankr.E.D.N.Y.1983). *See also,* Bankruptcy Rule 9017 which states that the Federal Rules Evidence and Rules 43, 44 and 44.1 of Federal Rules Civil Procedure apply to cases under the Code. Federal Rules Evidence 301 states that a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof or risk of non-persuasion which remains throughout the trial upon the party on whom it was originally cast.

■■■ The assessment of the Internal Revenue Service is presumptively correct. *Sinder v. United States,* 655 F.2d 729, 731 (6th Cir.1981); *Compton v. United States,* 334 F.2d 212, 216 (4th Cir.1964).

■■■ The Seventh Circuit Court of Appeals in *Ruth v. United States,* 823 F.2d 1091 (7th Cir.1987) stated: "We agree with the many courts that have held that once the government presents an assessment of liabili-

ty, the taxpayer bears the burdens of production and persuasion." *Id.*, 823 F.2d at 1093, n. 2 (collecting cases). In general, the Courts will not look behind an assessment to evaluate the procedure and evidence in making the assessment, rather the court conducts a de novo review of the correctness of the assessment, imposing the risk of non-persuasion on the taxpayer. *Id.*, 823 F.2d at 1094.

▮ In certain quite limited circumstances, however, the Courts recognize that an assessment should not be accorded even a rebuttable presumption of correctness. For example, when the assessment is shown to be without rational foundation, or arbitrary and erroneous, the presumption should not be recognized. *Id.*, 823 F.2d at 1094. *See also, United States v. Schroeder*, 900 F.2d 1144, 1147–48 (7th Cir.1990); *Pfluger v. C.I.R.*, 840 F.2d 1379, 1382 (7th Cir.1988); *Zuhone v. C.I.R.*, 883 F.2d 1317, 1325–26 (7th Cir.1989). The Debtors did not come forward with any competent evidence that the assessments were without rational, foundation, arbitrary or erroneous to rebut the presumption they were correct.

In *United States v. Charlton*, 2 F.3d 237 (7th Cir.1993), a bankruptcy case involving the objection by the debtor to a claim of the IRS based on § 6672(a), the Court observed, without discussing the legal effect of § 502(a), and Fed.R.Bk.P. 3001(f), that under § 6672(a), the burden is on the taxpayer to disprove the IRS' claim by a preponderance of the evidence, *citing, Ruth v. United States*, 823 F.2d at 1093, *supra,* a case decided outside the context of Bankruptcy Claim Litigation. *Id.*, 2 F.3d at 239–40.

In the subsequent case of *United States v. Running*, 7 F.3d 1293, 1297 (7th Cir.1993), a nonbankruptcy case, the Seventh Circuit stated as follows:

There is a dispute between the parties over who bears the burden of proving responsibility and willfulness under section 6672. "In this circuit, as in others, '[i]t is axiomatic that ... the Commissioner's tax deficiency determinations are to be presumed correct.'" *United States v. Schroeder*, 900 F.2d 1144, 1148 (7th Cir.1990) (*quoting, Barnes v. Commissioner*, 408 F.2d 65, 68 (7th Cir.), *cert. denied*, 396 U.S. 836, 90 S.Ct.

94, 24 L.Ed.2d 86 (1969)). Thus, we think it well settled that, "once the government presents an assessment of liability, the taxpayer bears the burdens of production and persuasion" with respect to both the responsibility and willfulness issues. *Ruth v. United States*, 823 F.2d 1091, 1093 (7th Cir.1987). *See also, Schroeder*, 900 F.2d at 1148; *Sawyer v. United States*, 831 F.2d 755, 758 (7th Cir.1987); *Kinnie v. United States*, 994 F.2d 279, 283 (6th Cir.1993); *Barnett v. IRS*, 988 F.2d 1449, 1453 (5th Cir.1993); *Hochstein v. United States*, 900 F.2d 543, 546 (2d Cir. 1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 2967, 119 L.Ed.2d 587 (1992).

The Court also notes in *In re Kirk*, 98 B.R. 51, 54–55 (Bankr.M.D.Fla.1989), the Court in *dicta*, in an innocent spouse case under IRC § 6013(d)(3), noted that under § 505 the focus is on the extent of the underlying tax liability of the debtor, and that the burden of proof would be on the debtor.

▮ The burden is on the taxpayer in the Tax Court, except with respect to the issue of fraud. 26 U.S.C. § 7454. It is similarly on the taxpayer in district court refund suits, even with respect to a Government counterclaim for an additional deficiency, the notice of which was issued during the suit, again except with respect to the issue of fraud. 26 U.S.C. § 7422(e). However, where the IRS, pursuant to 26 U.S.C. § 6214(a), asserts amounts of tax owed in excess of the amount specifically supported by the notice of deficiency, the burden of persuasion with respect to such additional amounts is on the Government. 26 U.S.C. § 7453, Tax Court Rule 142. This is logical for it is the deficiency notice that gives rise to the presumption of correctness of the Secretary's determination (and an assessment follows if the taxpayer does not file a petition with the Tax Court to redetermine a deficiency). For policy reasons, the burden should not necessarily vary from one forum to another. Some courts have concluded that the debtor has the burden of proof when objecting to a tax claim in bankruptcy. *See In re Landbank Equity Corp.*, 973 F.2d 265, 269–71 (4th Cir.1992); *Resyn Corp. v. United States*, 851 F.2d 660, 662–63 (3rd Cir.1988);

*Matter of Uneco, Inc.,* 532 F.2d 1204, 1207 (8th Cir.1976); *contra: In re Placid Oil Co.,* 988 F.2d 554, 557 (5th Cir.1993); *In re Fidelity Holding Co., LTD.,* 837 F.2d 696, 698 (5th Cir.1988); *In re Rasbury,* 130 B.R. 990, 1000–03, & n. 11 (Bankr.N.D.Ala.1991), *aff'd,* 141 B.R. 752 (N.D.Ala.1992); *In re Dakota Industries,* 131 B.R. 437, 443–45 (Bankr. D.S.D.1991). The Court concludes that the Debtors have the burden of proof with respect to the assessments and the items of income set forth in the deficiency notice and the United States has the burden with respect to more general allegations of additional income reserved by the deficiency notice and asserted in the Tax Motion. The Court concludes that in the least in the context of a § 505(a) Motion by the IRS to determine the tax liability of a debtor, as opposed to the objection by the debtor or trustee to a claim of the IRS versus the Debtor's estate, the presumption of correctness as to the amounts set out in any statutory assessment, or deficiency notice retains its validity, and thus the debtors bear both the burden of production and persuasion. The Court need not make any conclusions of law in the context of an objection to claim in this case, and declines to do so. In the event that this analysis is incorrect and the IRS has the burden of persuasion on all issues in a proceeding under 11 U.S.C. § 505, the IRS has met its burden.

4. The income tax under subtitle A of the Internal Revenue Code (26 U.S.C.) ["I.R.C."] is imposed on income from all sources. I.R.C. § 61. This includes income unlawfully derived and includes the income derived from embezzlement, fraud, or misappropriation, or deliberate conversion. *James v. United States,* 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961); *Rappaport v. United States,* 583 F.2d 298, 302 (7th Cir.1978); *McGee v. C.I.R.,* 519 F.2d 1121 (5th Cir.1975). These cases further confirm that the fact that the taxpayer may have an obligation, arising at law or equity, to make restitution, does not prevent the taxpayer from recognizing income at the time of the wrongful act. The taxpayer is, however, entitled to a deduction in the year in which any restitution is actually made. *James, supra,* 366 U.S. at 220, 81 S.Ct. at 1056.

5. At the same time, gifts are excluded from income.

6. In light of the Court's ORDER REQUIRING DEBTORS To FILE RESPONSES TO U.S. TAX MOTION, entered October 1, 1992, and the debtors' belated response of January 15, 1993, the Debtors' sole defense to the Tax Motion is the claim that "everything" the Debtor William received from Dr. Walters was a gift. See Supplemental Findings S ¶ 8. The more general "object(tion] to each and every charge in adversary 91–6073" was expressly precluded by the order (and in any event appears directed at the Complaint to revoke the Debtors' discharges, rather than to the Tax Motion).

7. The Court concludes that there was no gift by Dr. Walters to the Debtor William of Dr. Walters' coin collection or any of the other property which the United States contends constitutes income to the debtors. Apart from the testimony of Dr. Walters and Eleanor Walters refuting any gift, the notion of a gift as extensive as and covering all of the property referred to on the October 25, 1982 "gift document" (see Findings ¶ 78) is contradicted by a wealth of documentary evidence and prior inconsistent contentions, statements, and material omissions by the Debtor William at times when he would be expected to have disclosed this contention were it true. The Court concludes that the gift document was manufactured and, assuming the signature thereon to be Dr. Walters, that the latter signed the document either in blank form or otherwise without being aware of its contents. In any event, there was no contemporaneous delivery of the property referred in the gift document and therefore no effective gift at that time. At subsequent times when property was delivered, it was delivered under circumstances, including oral statements, that contradict any donative intent. For example, the coins were expressly entrusted to the Debtor William temporarily in 1984 because Dr. Walters was about to have surgery. Also, securities and checks were delivered to the Debtor William throughout 1983 and 1984, according to the Debtor William's own admissions, for the purpose of having him

liquidate or negotiate them and send the proceeds to Dr. Walters.

■ 8. The Debtors William and Terry realized unreported gross income in the amount of $5,000 in January of 1984 by virtue of the $19,000 withdrawal from the Lind–Waldock account deposited into the Debtor Terry's checking account and the return therefrom of $14,000 to the Lind–Waldock account. (See Findings ¶ 14.) (As used in this and the following paragraphs "unreported" refers to the fact that the income was not reported on any income tax return.)

■ 9. The Debtors William and Terry realized unreported gross income in the amount of $24,756 in June or July of 1984 by virtue of the Debtor William's liquidation of various bonds with the help of broker Dan Roszkowski at BE & L, the proceeds from which were deposited into the Debtor Terry's checking account. (See Findings ¶¶ 18 & 19)

■ 10. The Debtors William and Terry realized gross income in the amount of $7,674 in September of 1984 by virtue of the $14,804.27 withdrawal from the Lind–Waldock account deposited into the Debtor Terry's checking account and the use of $7,130 to buy a cashier's check payable to Joe CasioBarrin for the benefit of Dr. Walters. (See Findings ¶ 15.)

■ 11. The Debtors William and Terry realized unreported gross income in the amount of $16,312 in December of 1984 when the Debtor William only partially complied with Dr. Walters' request to send him the rest of what was maintained in the Guardian Trust accounts in Toronto and the Swiss Bank Corporation account in Basel. This figure includes the $2,805 left in the Swiss account (after the Debtor William wired $30,000 to the Roy West account as directed and which $2,805 was eventually withdrawn in 1986), the $4,000 withdrawn from Guardian on December 14, 1984, the disposition of which is unexplained (but which clearly was not transferred to the Swiss account as the Debtor William told the IRS investigator), and the $9,507 value of the Swiss Francs retained in the Guardian Trust account as of December 31, 1984 (which was later withdrawn in 1985 after its value was reduced to $8,314, and which is also unaccounted for but which also was not transferred to the Swiss account as the Debtor William told the IRS investigator). (See Findings §§ 30–35.) The Debtor William intended to keep these funds for his own benefit by the close of the 1984 year and it is proper to include them in income in that year and to value them as of that time.

12. Although the 1984 deficiency notice asserts that the entire $32,855 wire-transferred from Guardian Trust to the Swiss account on November 2, 1984, constituted income, the United States conceded at trial that it did not because $30,000 of that amount was later wire-transferred through Morgan Guaranty Trust in New York for the Roy West account in the Cayman Islands. (See Findings ¶¶ 21–23.) Only the $2,805 then left in the Swiss account constitutes income as indicated in the preceding paragraph. However, that $2,805 may not be charged to the Debtor William as income in 1986 as alleged in the deficiency notice respecting that year since it will be considered income in 1984 for the reason stated in the preceding paragraph. Similarly, the $8,314 withdrawn from the Guardian Trust account in 1985 may not be charged as income in that year as alleged in the deficiency notice respecting that year since it will be considered income in 1984 for the reason state in the preceding paragraph.

■ 13. The Debtors William and Terry realized gross income in the amount of $162,500 in 1984 in the value as of that time of the coins which he never returned to Dr. Walters. (See Findings ¶ 49.) It is apparent from all of the facts that the Debtor William had determined by 1984 to steal whatever he could get away with from his father and thus would keep the coins to whatever extent possible. Also, the Tax Motion expressly alleges that the coins were misappropriated in 1984 and should be included in income in that year with corresponding downwards adjustments made in the tax deficiencies asserted for 1985 and 1986. For the reason set forth in Conclusions ¶ 6 above, the Debtors William and Terry waived the right to con-

test this allegation, except by proving that there had been a gift.

14. The proceeds of coins liquidated in 1985 and 1986 may not be treated as income in those years as alleged in the deficiency notice pertaining to those years because the total value of all coins not returned to Dr. Walters will be treated as income in 1984 for the reasons just indicated. (This includes the Engstrom's Coin Shop payments of $20,000 in 1985 and $10,000 in 1986, the $3,150 Coin Investors Shop payment on May 30, 1986, and the $19,000 Nunemaker's Coin Shop payment on October 22, 1986.)

15. The Debtor William realized unreported gross income in the amount of $33,104 in May or June of 1985 when he fraudulently obtained loans in Dr. Walters' name against the cash surrender values of the life insurance policies that were the corpus of the irrevocable trust at Citizens Bank, and negotiated the checks reflecting the loan proceeds. (See Findings ¶¶ 33–35.) To the extent that a de minimis portion of these funds may have been returned to the life insurance companies (See Findings ¶ 35), the Court concludes that, under *James, supra,* the full value of the property misappropriated constitutes income, while any restitution would support a deduction at the time of such restitution, and the Debtor William has failed to substantiate the amount of any such deductions.

16. The Debtor William realized unreported gross income in the amount of $16,437 in early 1986 when he liquidated Swiss Franc traveler's checks for U.S. currency in that amount at Citizen's Bank. (See Findings ¶ 37.)

17. The Debtor William realized unreported gross income in the amount of $6,000 on December 16, 1986, when he wrote a check for that amount on the line of credit account he fraudulently opened in Dr. Walters' name at American Express Centurion Bank of Newark, Delaware and deposited into the Debtor William's MCC account. (See Findings ¶ 53.) The $4,000 similarly drawn on the line of credit account on January 13, 1987, similarly reflect income to the Debtors William and Terry which their 1987

joint income tax return fails to indicate. (Findings ¶ 60.) Although the 1987 year is not currently before the Court, this adds support for the conclusion of a pattern of fraud by the Debtor William so as to justify the 1984–86 fraud penalties as noted below.

18. The Debtors William and Terry should have reported an additional $216,242 in gross income on their 1984 tax return (to be partially offset by a $3,000 capital loss allowed on the 1984 year deficiency notice). This is far more than the $61,611 in unreported gross income charged in the 1984-year deficiency notice. The United States is given 30 days to file and serve a recomputation of the tax and penalties asserted in the deficiency notice. Upon such submission it may adjust the assessments of tax, penalties, and interest accordingly; provided however that the Court reserves jurisdiction to redetermine the correctness of the recomputations to the extent that the Debtors thereafter demonstrate to the satisfaction of the Court that the computations are incorrect. For this purpose, the Debtors shall have 30 days from service of the United States' recomputation to serve and file any objections thereto, explaining in detail precisely what they contend is incorrect and why. Failure to object timely or to give sufficient specificity shall be deemed a waiver.

19. The Debtor William should have reported an additional $33,104 in gross income on his 1985 income tax return (in addition to the $61 in interest income shown on the deficiency notice, which has not been challenged, and partially offset by the $1,500 capital loss allowed by the IRS on the 1985/86 deficiency notice). He should also have reported an additional $22,437 in gross income on his 1986 income tax return (in addition to the $101 in interest income shown on the deficiency notice, which has not be challenged, and partially offset by the $1,500 capital loss allowed by the IRS on the 1985/86 deficiency notice). These figures are less than the amounts of embezzlement income charged on the 1985/86 deficiency notice ($61,418 and $32,150 for 1985 and 1986 respectively). The United States is given 30 days to file and serve a recomputation of the tax and penalties asserted in the 1985/86–

year deficiency notice. Upon such submission it may partially abate the assessments of tax, penalties, and interest accordingly. The provisions of the preceding paragraph relating to objections and possible redetermination by the Court shall apply.

20. None of the income which should have been reported on the 1984, 1985, or 1986 tax returns at issue was reported on the 1987 or 1988 returns and there is no evidence to indicate that it was reported in any other year.

21. I.R.C. § 6661 as applicable to the 1984, 1985, and 1986 years provided for a penalty equal to 25% of the amount of any underpayment attributable to a "substantial understatement" of tax, defined to mean an understatement which exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. Pursuant to § 8002(a) of Public Law 99–509, this version of the penalty was applicable to any assessment made after October 21, 1986, regardless of the tax year involved. (Section 7721 of P.L. 101–239 repealed I.R.C. § 6661 for returns due after December 31, 1989.)

22. It is clear that when the 1984 tax is recomputed by the IRS as directed by the Court, the tax shown on the Debtors William and Terry's joint 1984 return—zero—will be revealed as a "substantial understatement" within the meaning of I.R.C. § 6661(b). There is no "reasonable cause" for this understatement within the meaning of I.R.C. § 6661(c) and the Debtors William and Terry are liable for the substantial understatement penalty equal to 25% of the tax as recomputed.

23. It similarly appears that when the 1985 tax is recomputed by the IRS as directed by the Court, the tax shown on the Debtor William's 1985 return—zero—will be revealed as a "substantial understatement" within the meaning of I.R.C. § 6661(b). There is no "reasonable cause" for this understatement within the meaning of I.R.C. § 6661(c) and the Debtor William is liable for the substantial understatement penalty equal to 25% of the tax as recomputed; provided, however, that if the tax as recomputed is less than $5,000, then the Debtor William is not liable for the substantial understatement penalty.

24. With respect to the 1986 year, it appears that the tax as recomputed by the IRS is likely to be less than $5,000. If that is the case, the Debtor William is not liable for the substantial understatement penalty. If the tax is more than $5,000, since the tax shown on the return is zero, then the Debtor William shall be liable for the substantial understatement penalty equal to 25% of the tax.

25. I.R.C. § 6653(b), as applicable to the years in question, provided for fraud penalties if any part of any underpayment of tax required to be shown on a return was due to fraud. For the years 1984 and 1985 years, the penalties were (1) 50 percent of the entire tax underpayment plus (2) 50 percent of the interest on that portion of the tax underpayment that is attributable to fraud from the due date of the tax to the date of assessment (after which statutory interest accrued on the assessed penalties). For the 1986 year, the penalties were (1) 75 percent of that portion of the underpayment attributable to fraud plus (2) the same 50 percent of interest penalty applicable to the earlier years. (Section 325 of P.L. 97–248 effected the language applicable to the 1984 and 1985 years, effective with respect to taxes due after September 3, 1982. Section 1503 of P.L. 99–514 effected the language applicable to the 1986 years, effective with respect to returns due after December 31, 1986.) For the 1984 year, the fraud penalty does not apply to the tax of a spouse if no part of the underpayment is due to fraud of such spouse. I.R.C. § 6653(b)(4) (1984).

26. The burden of proof with respect to fraud is on the Government. I.R.C. § 7454. Although there is a long line of cases suggesting that this burden must be met by clear and convincing evidence, nothing in the Internal Revenue Code requires this, and –[n]one of these cases, though, does more than borrow uncritically the common law rule." *Spitz v. C.I.R.*, 954 F.2d 1382, 1383 (7th Cir.1992). As observed in *Spitz*, 954 F.2d at 1383:

recent decisions by the Supreme Court holding that securities fraud and bankruptcy fraud need be proved only by a prepon-

derance of the evidence, *Herman & Mac-Lean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), suggest that the application of the common law rule to tax fraud may be due for reexamination.

Indeed, *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654 *supra,* suggests that unless Congress indicates an intent to establish a higher burden, the test should generally be the preponderance-of-evidence test. The Court concludes that the Government need only establish fraud by a preponderance of the evidence. Although the clear-and-convincing-evidence standard is a rule adopted by the U.S. Tax Court (I.R.C. § 7453, Tax Court Rule 142(b)), the authority of the Tax Court to establish a rule of substantive law such as a heightened burden of proof, if not intended by Congress, is highly questionable, and such a rule would not apply in this Court in any event. However, to the extent this conclusion is incorrect, the Court concludes that the Government has met the higher standard of clear and convincing evidence of fraud.

27. A mere understatement of income does not establish fraud but a consistent pattern of understatement of substantial amounts over a period of years is persuasive evidence of fraudulent intent to evade taxes. *Estate of Upshaw v. C.I.R.,* 416 F.2d 737 (7th Cir.1969), cert. denied 397 U.S. 962, 90 S.Ct. 993, 25 L.Ed.2d 254 (1970). Similarly, the mere failure to declare unlawful gains does not establish fraudulent intent. *McGee v. C.I.R., supra,* 519 F.2d at 1125.

28. "Fraud is a factual question to be determined on the basis of the entire record.... Fraud can seldom be established by direct proof of the taxpayer's intention; therefore, [taxpayer's] entire course of conduct must be considered and his fraudulent intent can be established by circumstantial evidence." *Fugger v. Commissioner,* 49 (CCH) T.C.M. 483, 487 (1985). A willful attempt to evade tax may be found "from any conduct calculated to mislead or conceal.—*Id.* at 488.

29. A material misstatement to an IRS investigator constitutes probative evidence tending to support a determination of fraud. *McGee,* supra, 519 F.2d at 1126; *Upshaw, supra.*

30. Concealment of ownership of property traceable to unreported income, such as by holding title under false names or under the names of others, is probative evidence tending to support a determination of fraud. *Id.*

31. The Debtor William is liable for the fraud penalties with respect to all three years at issue. He was a commodities trading advisor knowledgeable in matters of finance and investment. (Finding ¶ 98.) When he signed the 1984–86 returns, he had been told by his accountant in respect to the 1983 return that sums derived from retention of Dr. Walters' property constituted income. (Findings ¶ 99.) His response to this advice demonstrated knowledge of applicable tax principles. (Findings ¶ 100.) He wrote a letter to a newspaper for publication, expressing confidence of his ability to come through a tax audit without any determination of liability and told his own sister that she was "stupid" for paying taxes. (Findings ¶ 101.) By the time he signed the returns at issue, beginning May 23, 1986, he had already signed the April 7, 1986 agreement to repay Dr. Walters $300,000 "or items which I took" from Dr. Walters. (Findings ¶¶ 45, 57.) He placed his funds in a bank account under a fake corporate name ("Keliter") and used that same name on the title of an expensive vehicle purchased with the unreported income. (Findings ¶¶ 26, 36.) He liquidated over $16,000 worth of Swiss Franc traveler's checks and did it in two installments of around $8,000 each, in an unsuccessful effort to avoid prompting the bank to file currency transaction reports with the IRS, required for transactions involving $10,000 or more. (Findings ¶ 37.) When deposed in 1987 by an attorney with the Tax Division of the Department of Justice, he lied about the existence of the Keliter account. (Findings ¶ 72.) However, when deposed a couple of weeks later by an insurance lawyer, he freely described the account as his own personal checking account. (Findings ¶ 26.) He subsequently made false statements to an IRS criminal investigator, claiming that cer-

tain funds had been returned to Dr. Walters which are objectively documented as having not been returned to Dr. Walters. (Findings ¶ 35.) The amounts of unreported income involved are substantial both in isolation and in relation to the reported income and the under reporting is sustained over a period of four years (counting 1987, see Findings ¶ 53, even though the tax for that year is not at issue in this case). To the extent necessary, the United States has proved the Debtor William's fraudulent intent by clear and convincing evidence.

## B

*Conclusions of Law and Discussion as to Count I of Adversary Proceeding No. 91–6073, United States v. William G. Walters and Terry M. Walters as Supplemented by the United States (Revocation of Discharge pursuant to § 727(d))* [19]

1. The Court concludes that it has subject matter jurisdiction over Adversary Proceeding No. 91–6073, pursuant to 28 U.S.C. § 1334, and that this Adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).

2. Federal Rule of Bankruptcy Procedure 4005 expressly provides that the burden of proof in objecting to discharge under § 727(c) is on the Plaintiff. No comparable provision is found in the Rules where, as here, the creditor is requesting that the Debtor's discharge be revoked pursuant to § 727(d) as in this Adversary Proceeding.

■ The case law clearly indicates that the United States has the burden of proof under § 727(d). *Matter of Yonikus,* 974 F.2d 901, 904 (7th Cir.1992).

The standard of proof is likewise not set out in the Code or the Rules. In the case of *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), the Supreme Court held that the standard of proof in a nondischargeability proceeding under § 523(a) is the preponderance-of-the-evidence standard, rather than the more stringent standard of clear and convincing evidence.

■ It has been held since *Grogan v. Garner,* that the standard or degree of proof in a proceeding to revoke a general discharge pursuant to § 727(d) is by a preponderance-of-the-evidence rather than by clear and convincing evidence. *In re Serafini,* 938 F.2d 1156, 1157 (10th Cir.1991); *In re Wolfson,* 139 B.R. 279, 282–85 (Bankr.S.D.N.Y.1992); *In re Essres,* 139 B.R. 958, 961 (D.Col.1992); *In re Lawler,* 141 B.R. 425, 428–20 (9th Cir. BAP 1992). The Court agrees with the conclusions reached by the Courts in the above cases, and will no longer apply the clear and convincing standard that it did in *In re Montgomery,* 86 B.R. 948, 955 (Bankr. N.D.Ind.1988), decided before *Grogan v. Garner.* In addition, the Court cannot perceive any basis for applying a higher standard of proof when, as here, the United States is requesting that the Debtor's discharge be revoked pursuant to § 727(d), as opposed to objecting to discharge pursuant to § 727(c).

19. Section 727(d) states as follows:
(d) On request of the trustee, a creditor, or the United States trustee, and after notice and a hearing, the court shall revoke a discharge granted under subsection (a) of this section if—
(1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge;
(2) the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee; or
(3) the debtor committed an act specified in subsection (a)(6) of this section.

Section (a)(6) referred to in § 727(d)(3) states as follows:
(6) the debtor has refused, in the case—
(A) to obey any lawful order of the court, other than an order to respond to a material question or to testify;
(B) on the ground of privilege against self-incrimination, to respond to a material question approved by the court or to testify, after the debtor has been granted immunity with respect to the matter concerning which such privilege was invoked; or
(C) on a ground other than the properly invoked privilege against self-incrimination, to respond to a material question approved by the court or to testify;

3. As the Court stated in *Matter of Yonikus*, 974 F.2d 901, *supra:*

To find the requisite degree of fraudulent intent, the court must find the debtor knowingly intended to defraud the trustee, or engaged in such reckless behavior as to justify the finding of fraud. *In re Puente*, 49 B.R. [966] at 969 [Bankr.W.D.N.Y.1985]. The trustee may prove the debtor's fraud by evidence of the debtor's awareness of the omitted asset and by showing that the debtor knew that failure to list the asset could seriously mislead the trustee or that the debtor acted so recklessly in not reporting the asset that fraud is implied. 4 *Collier on Bankruptcy* ¶ 727.15[4] (1992). The bankruptcy court's finding of fraudulent intent may be based on inferences drawn from a course of conduct. *In re Devers*, 759 F.2d 751, 753–754 (9th Cir. 1985); *Farmers Co-op. Ass'n of Talmage, Kan. v. Strunk*, 671 F.2d 391, 395 (10th Cir.1982); *In re Kindorf*, 105 B.R. 685, 690 (Bankr.M.D.Fla.1989). Additionally, fraudulent intent may also be inferred from all of the surrounding circumstances. *Matter of Reed*, 700 F.2d 986, 991 (5th Cir.1983) (The debtor's "whole pattern of conduct" supports the bankruptcy court's finding of fraudulent intent); *In re Kindorf*, 105 B.R. at 689. Concealment of assets can be grounds for disallowance of exemptions, "to hold otherwise would be to reward debtors who conceal assets from the estate." *In re Magnuson*, 113 B.R. 555, 560 (Bankr.D.N.D.1989).

*Id.,* 974 F.2d at 905–06.

4. The Debtors William and Terry falsely stated on their Statement of Financial Affairs that they made no transfers of property within the year preceding their bankruptcy petition. (Findings ¶¶. 74, 107).

■ 5. The United States has submitted sufficient competent evidence to show by a preponderance-of-the-evidence that a large amount of missing property of Dr. Walters remains unaccounted for, the property listed on the Debtor Terry's asbestos claim, and the value of the personal property stated on her residential loan application of October 29, 1993, there is an inference that can be made from all of the surrounding circumstances that the Debtors William and Terry retained assets that were fraudulently not disclosed by their Schedules and intentionally and fraudulently omitted therefrom. The case might be different had the Debtor William admitted misappropriating Dr. Walters' property and acknowledged the non-dischargeable debt therefor in Adv. No. 90–6030, but at the same time maintained that he had expended all of it prior to the petition date. Instead, the Court is left with an obvious trail of deceptions by which the Debtor William has attempted to evade both his tax debts and a non-dischargeable debt to Dr. Walters through a false claim that the property was a gift and through demonstrably false assertions that certain portions of the misappropriated property or its proceeds were returned to Dr. Walters. The Court concludes that the Debtors William and Terry have absolutely no credibility. The Court may also draw an adverse inference from their failure to appear and testify on their own behalf at trial. Accordingly, the Debtors' discharge shall be revoked pursuant to § 727(a)(2).

■ 6. The Court may also enter a default judgment against the Debtors for failing to appear at the trial, particularly in light of the October 1, 1992 order requiring them to attend pursuant to Fed.R.Civ.P. 16(f) as made applicable by Fed. R. Bk. P. 7016. *See, e.g., Matter of Besecker*, 148 B.R. 294, 296 (Bkrtcy.S.D.Ohio 1992) (default judgment for failing to obey pretrial order requiring certain filings). *See also Barreto v. Citibank N.A.*, 907 F.2d 15 (1st Cir.1990) (dismissal); *Malone v. U.S. Postal Service*, 833 F.2d 128 (9th Cir.1987), cert. denied 488 U.S. 819, 109 S.Ct. 59, 102 L.Ed.2d 37 (1988) (dismissal). The trial dates of February 2–4, 1994, were set during the final pretrial conference with the Debtor William in attendance. Although the Debtor Terry failed to attend that final pretrial conference (which itself is expressly made a ground for default under Fed. R.Civ.P. 16), notice of the trial setting was thereafter distributed. While the precise time of the morning was left unspecified pending notification by government counsel of his flight schedule, government counsel telephonically confirmed with the Court on

January 31st that trial could begin at 10:30 and, at the Court's direction, he then notified the Debtors that it would begin at that time. The debtors did not appear at 10:30 or any subsequent time on February 2nd or 3rd, through which the trial continued. The Court concludes that Debtors had ample notice as well as an obligation to inquire. Moreover, their affidavits purporting to withdraw their signatures on their bankruptcy petitions suggest that they deliberately and contumaciously refused to obey the order requiring them to attend. (Of course, if the debtors could withdraw the signatures on their bankruptcy petitions, their discharges would have to be vacated accordingly.)

■■■■■ A default judgment entered in connection with the failure to comply with pretrial orders is a drastic remedy which should be utilized only in extreme situations. *National Hockey League v. Metro Hockey Club, Inc.*, 427 U.S. 639, 640–43, 96 S.Ct. 2778, 2780–81, 49 L.Ed.2d 747 (1976). Among the sanctions available for the violation of pretrial orders pursuant to Fed. R.Civ.P. 16(f) is the entry of a default judgment. *See, e.g., Coleman v. Smith*, 814 F.2d 1142 (7th Cir.1987). The Court also has the inherent power to invoke sanctions for conduct which abuses the judicial process. *Barnhill v. United States*, 11 F.3d 1360, 1367 (7th Cir.1993). However, the Court declines to invoke such a draconian sanction in this case notwithstanding the sometimes truculent, and recalcitrant, conduct of the Debtors. They are *pro se*, and the revocation of their discharge can have substantial, serious, and long lasting consequences. Thus, it is better that these proceedings be submitted and decided on the merits. However, this does not mean that these very same acts of the Debtors in failing to comply with the various orders of this Court, without justification or excuse, are not a basis for a judgment of revocation of their general discharge pursuant to § 727(d)(3) and (a)(6) on the merits as discussed, *infra.*

■■■■■ 7. Section 727(d)(3) of the Bankruptcy Code provides for revocation of a discharge for any act specified in subsection (a)(6). Subsection (a)(6) includes a Debtor's refusal to obey a court order (other than one

to testify, assuming a proper privilege is invoked).

In addition, Fed.R.Bk.P. 4002(1) provides that the Debtors shall attend and submit to examination at the times ordered by the Court, while Fed.R.Bk.P. 4002(2) provides that the Debtors shall attend the hearing on a complaint objecting to discharge, and testify, if called as a witness. Although the Complaint of the United States was to revoke the Debtors' Discharge pursuant to § 727(d), rather than an objection to discharge under § 727(c), the Court concludes that the Debtors had a duty to appear and testify.

■■■■■ 8. The Debtors' discharge should be revoked pursuant to §§ 727(a)(6) and (d)(3) because the Debtors disobeyed the Court's express Order of October 1, 1992, to personally participate in all proceedings before the Court. The Debtors also failed to produce all documents requested of them and the Debtor William's failure was deliberate. The Debtor Terry, at least, could afford to pay the sanctions ordered against the Debtors, and thus violated the Court's Order in failing to do so. (*See,* Supplemental Findings, ¶¶ S–1 through S–16, *supra*).

■■■■■ 9. Another factor supporting revocation is that, apart from disobeying the October 1, 1992 order to participate personally in all proceedings, the Debtors have exhibited an attitude of contempt toward this Court by submitting frivolous papers despite warnings and threats of sanctions. The latest but certainly not the most important example of this is their affidavits purporting to withdraw the signatures on their bankruptcy petitions.

## C

### Conclusions of Law and Discussion as to Adversary Proceeding No. 90–6030, William H. Walters v. William G. Walters (Nondischargeability of indebtedness pursuant to § 523(c)(1) and § 523(a)(6))

1. The Court concludes that subject matter it has jurisdiction over Adversary Proceeding No. 90–6030, pursuant to 28 U.S.C. § 1334, and that this Adversary proceeding

878

is Core Proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

2. This Court would also note that it has the authority to determine both the dischargeability of any indebtedness of the Defendant to the Plaintiff (liability), and damages. *In re Hallahan*, 936 F.2d 1496, 1507–08 (7th Cir.1991).

3. In keeping with the purpose of the Bankruptcy Code, exceptions to the general rule of dischargeability of debts are to be strictly construed against the creditor and liberally in favor of the Debtor. *Matter of Scarlata*, 979 F.2d 521, 524 (7th Cir.1992) *citing, In re Zarzynski*, 771 F.2d 304, 306 (7th Cir.1985); *In re Linn*, 38 B.R. 762, 763 (9th Cir. BAP 1984); *In re Marino*, 29 B.R. 797, 799 (N.D.Ind.1983). The exceptions to dischargeability must be narrowly construed against the creditor's objections, and confined to those plainly expressed in the Code. *In re Norman*, 25 B.R. 545, 547 (Bankr. S.D.Cal.1982). This is done to effectuate the fresh start policies of the Bankruptcy Code. *In re Levitan*, 46 B.R. 380, 383 (Bankr. E.D.N.Y.1985); *In re Nicoll*, 42 B.R. 87, 90 (Bankr.N.D.Ill.1984).

4. In an Adversary Proceeding to determine the nondischargeability of a debt the burden of proof is on the plaintiff as to each element. *Matter of Scarlata*, 979 F.2d at 524, *supra; In re Kreps*, 700 F.2d 372, 376 (7th Cir.1983). *See also, In re Martin*, 698 F.2d 883, 887 (7th Cir.1983), (General § 727 discharge case).

5. This Court in the case of *In re Johnson*, 109 B.R. 885 (Bankr.N.D.Ind.1989) had occasion to discuss at some length what constitutes "willful and malicious" injury to another entity, or the property of another entity for the purposes of § 523(a)(6).

6. In addition, this Court in the case of *In re Mills*, 111 B.R. 186 (Bankr.N.D.Ind.1988), had occasion to discuss at some length the dischargeability of a debt under § 523(a)(6) based on an alleged conversion of property of another.

Rather than replicate those opinions, the Court will summarize their salient points.

1. The Plaintiff has the burden of proof to show in the conjunctive that the acts or conduct of the Debtor complained of were *both* "willful and malicious".

2. Federal law rather than state law controls as to whether an act is "willful and malicious" for the purposes of § 523(a)(6), although the Bankruptcy Court can look to State Tort Law for guidance.

3. Although the Debtor may be liable for a technical, innocent, or mistaken conversion under state common law, even if there is no "mens rea", § 523(a)(6) requires willfulness and malice as defined by federal standards.

4. Mere negligence, reckless disregard, or even gross negligence is not sufficient to establish "willful" conduct under § 523(a)(6) by federal standards. The acts must be intentional and deliberate.

5. For an act to be "willful and malicious", the debtor must act in an intentional or deliberate manner without just cause or excuse, which produces or results in harm or injury, but the debtor need not have a specific intent to cause the resulting harm or injury to the person or property of the plaintiff. It is the intent to do the act which is the operative legal event, and not the intent to do the harm.

6. As to the "malicious" element, the plaintiff need not show actual and personal ill will, hatred or special malice by the debtor toward him. Constructive or implied malice is sufficient, and a specific intent to do harm to the plaintiff is not necessary as long as there was an intent to do a wrongful act knowing it would harm or damage the plaintiff.

7. Subsequent to this Court's decisions in *In re Johnson*, 109 B.R. 885, *supra*, and *In re Mills*, 111 B.R. 186, *supra*, the United States Supreme Court in the case of *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), held that the standard of proof in nondischargeability proceedings under § 523(a) is a preponderance-of-evidence standard, rather than the more stringent standard of clear and convincing evidence. Thus, the clear and convincing standard set out by the United States Court of Appeals in

*In re Kimzey,* 761 F.2d 421, 423 (7th Cir. 1985), and *Matter of Bogstad,* 779 F.2d 370, 372 (7th Cir.1985) is no longer applicable.

■ 8. It is clear that a debt for wilful and malicious conversion of property of another entity is nondischargeable under § 523(a)(6). *In re Kimzey,* 761 F.2d 421, 424 (7th Cir.1985), *citing, In re Meyer,* 7 B.R. 932, 933 (Bankr.N.D.Ill.1981), with approval. A debt may be nondischargeable under § 523(a)(6) when the debtor has sold collateral subject to a security agreement thereby depriving the creditor of its secured interest. *Id.* 761 F.2d at 425. When the debtor sells secured collateral, the creditors' security interest—its protection against the debtor's bankruptcy vanishes. *Id.* Finding the debt nondischargeable under § 523(a)(6) thus puts the creditor in the same position he would have been in but for the wilful and malicious conversion. *Id. See also, Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934) (interpreting § 17(2) of the former Bankruptcy Act, former 11 U.S.C. § 35). *Collier on Bankruptcy,* ¶ 523.16(3), pp. 523–136–140 (L. King 15th ed.).

However, as noted by Judge Cardozo in *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, *supra:*

> There is no doubt that an act of conversion, if wilful and malicious, is an injury to property within the scope of this exception. Such a case was *McIntyre v. Kavanaugh,* 242 U.S. 138 [37 S.Ct. 38, 61 L.Ed. 205 (1916)], where the wrong was unexcused and wanton. But a wilful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without wilfulness or malice. *Boyce v. Brockway,* 31 N.Y. 490, 493; *Laverty v. Snethen,* 68 N.Y. 522, 527; *Wood v. Fisk,* 215 N.Y. 233, 239, 109 N.E. 177; *Stanley v. Gaylord,* 1 Cush. (Mass.) 536, 550; *Campau v. Bemis,* 35 Ill.App. 37; *In re De Lauro,* 1 F.Supp. 678, 679 [(D.Conn. 1932)]. There may be an honest, but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like

cases, what is done is a tort, but not a wilful and malicious one.

*Id.,* 293 U.S. at 332, 55 S.Ct. at 153.

■ 9. The Debtor William, when confronted by Dr. Walters about misappropriating his coin collection, and other property, signed a note promising on April 7, 1986 to pay Dr. Walters $300,000 for "items which I took on or before April 7, 1986" (Findings ¶ 45). In addition to all of the other evidence relating to the wrongful misappropriation of Dr. Walters' property by the Debtor William, this note is tantamount to an evidentiary admission by a party opponent pursuant to Fed.R.Evid. 801(d)(2), and a statement against interest pursuant to Fed.R.Evid. 804(b)(3), of willful and malicious conversion by the Debtor William of property of Dr. Walters, at least to the extent of $300,000. The note does not in any way recite that it was given in full and complete settlement of any underlying obligations arising out of a conversion cause of action that Dr. Walters had against the Debtor William. No release of the underlying conversion claim was executed by Dr. Walters in favor of the Debtor William, either in conjunction with the note or separately. The evidence is clear that the Debtor made no payments to Dr. Walters on the note. Indiana Code 26–1–3–802 provides in part as follows:

> (1) Unless otherwise agreed where an instrument is taken for an underlying obligation
>
> \* \* \* \* \* \*
>
> (b) in any other case [i.e. other than if the Bank is a drawer, *see,* I.C. 26–1–802(a)(1)] the obligation is suspended pro tanto until the instrument is due or if it is payable on demand until its presentment. If the instrument is dishonored action may be maintained on either the instrument or the obligation; discharge of the underlying obligor on the instrument also discharges him on the obligation.

Thus, because the note did not otherwise provide for a release of the underlying conversion claim which it evidenced, and was completely dishonored by the Debtor William, Dr. Walters had the option to proceed with his underlying conversion action versus

the Debtor William in this Adversary Proceeding pursuant to § 523(a)(6), rather than being the mere holder of a note. Accordingly, the Debtor William's underlying tort obligation to Dr. Walters was not discharged simply because the conversion debt was subsequently evidenced by the promissory note. *See, e.g., American States Insur. Co. v. Staub, Inc.*, 175 Ind.App. 244, 370 N.E.2d 989, 995–96 (1st Dist.1977); *In re Midwest Boiler and Erectors*, 54 B.R. 793, 795 (Bankr. E.D.Mo.1985).

 10. In addition, the case law in Indiana is well settled that where a debtor under an accord and satisfaction or compromise and settlement fails to pay the agreed amount, the creditor may resort to his original cause of action, or may sue on the compromise agreement, *Indiana Farmers Mutual Insurance Co. v. Walters*, 221 Ind. 642, 50 N.E.2d 868 (1943). In *Indiana Farmers, supra*, the insurance company issued a policy to cover a dwelling valued at $2,500.00, and a smoke house valued at $300.00. After both buildings burned down, the insurance company offered a total of $2,500.00 to settle and the insured accepted. The insurance company then failed to pay and the insured sued for the original amount of $2,800.00. The Court stated as follows:

> Finally appellant contends that the agreement was an accord but since there was no satisfaction it is not enforceable. The distinction between an accord and satisfaction and a compromise and settlement is shadowy. 1 C.J.S., *Accord and Satisfaction,* § 1(4) p. 464. The general rule as to the effect of a compromise is stated in 15[A] C.J.S., *Compromise and Settlement,* § 24, as follows: "A valid agreement of compromise and settlement is a merger and bar of all preexisting claims." The agreement need not have been performed in order to constitute a bar, although there is contrary authority.

> In the cases cited by the appellant recovery was sought on the original cause of action and it was held that an accord, not followed by satisfaction, was not a bar. By refusing or failing to pay the agreed amount, be it called an accord or a compromise, the obligor is in no position to complain if the obligee abandons the compromise and resorts to his original cause of action.

*Id.,* 50 N.E.2d at 870–71.

Accordingly, this case is distinguishable from that of *Maryland Casualty Co. v. Cushing,* 171 F.2d 257, 258–59 (7th Cir.1948), *cited with approval* in the recent case of *Matter of West,* 22 F.3d 775 (7th Cir.1994). The Court in *Maryland Casualty* held that a promissory note generally does not discharge the debt for which it was given, but fully discharges the original debt it if is shown that the note was given and received as payment or waiver of the original debt, and the parties agreed that the note was to substitute the new obligation for the old.

In *West,* the Debtor had embezzled $100,-000 from her employer. In consideration for a note in the sum of $75,000, the employer executed a covenant not to sue and a general release in favor of the Debtor. The Debtor then filed Chapter 7, and the employer filed a § 523(a)(4) proceeding alleging the debt was nondischargeable. The Seventh Circuit concluded the debt was dischargeable as the obligation was based on the note, rather than the fraudulent conduct that gave rise to the note. The facts in this case are clearly distinguishable from *West,* and thus the Court concludes that Dr. Walters may proceed under § 523(a)(6) as there was no intent that the conversion debt be released or extinguished by the note.

11. Dr. Walters stipulated by pretrial order that the maximum compensatory damages that he was seeking was the principal sum of $300,000. Thus, Dr. Walters shall be awarded that amount, plus interest.

 In a federal court wherein a state based claim is being adjudicated, damages are determined by the applicable state law. *Lincoln Nat. Life Insur. Co. v. NCR Corp.,* 772 F.2d 315 (7th Cir.1985). Federal Courts applying Indiana Law use the doctrine of *lex fori* as to damages, *Id., citing, Prudence Life Insurance Co. v. Morgan,* 138 Ind.App. 287, 213 N.E.2d 900 (1966). Under Indiana law, the burden of pleading and proving damages rests with the plaintiff. *Id., citing, Rauch v.*

*Circle Theatre,* 176 Ind.App. 130, 374 N.E.2d 546, 553 (1978).

 The same principles apply to the enforcement of a state-based claim in the bankruptcy court. While bankruptcy law provides the federal machinery for enforcing a creditor's rights, the rights themselves are created by state law. *Matter of Chicago, Milwaukee, St. Paul & Pacific R. Co.,* 791 F.2d 524 (7th Cir.1986).

 When a federal judgment is based on a state law claim, as here, the Court must look to state law to determine the propriety of prejudgment interest on recovery. *The Travelers Insurance Company v. Transport Insurance Company,* 846 F.2d 1048 (7th Cir.1988). However, federal law governs as to post judgment interest on a federal judgment. *Id. See,* 28 U.S.C. § 1961(a).

Indiana courts have awarded prejudgment interest to a claimant as an element of damages. Indiana Code 24–4.6–1–102 governs the rate of prejudgment interest in Indiana in absence of an agreement and provides as follows:

> When the parties do not agree on the rate, interest on loans or forbearances of money, goods or things in action shall be at the rate of eight percent (8%) per annum until payment of judgment.

The Court in *Fort Wayne National Bank v. Scher,* 419 N.E.2d 1308 [Ind.App.1981], *supra,* stated as follows:

> Interest is recoverable in actions in tort where the damages sought to be recovered are complete and ascertainable as of a particular time and in accordance with fixed rules of evidence and known standards of value. *Rauser v. LTV Electrosystems* (7th Cir.1971), 437 F.2d 800; *Independent Five & Ten [Cent] Stores of N.Y. v. Heller,* (1920), 189 Ind. 554, 127 N.E. 439; *New York etc. v. Roper,* (1911), 176 Ind. 497, 96 N.E. 468: *Indiana Telephone Corp. v. Indiana Bell Telephone Co., Inc.,* (1976), 171 Ind.App. 616, 358 N.E.2d 218; *Soft Water Utilities, Inc. v. LeFevre,* (1974), 159 Ind.App. 529, 308 N.E.2d 395; *New York Central Railroad Co. v. Church-*

*ill,* (1966), 140 Ind.App. 426, 218 N.E.2d 372.

The award of interest is founded solely upon the theory that there has been a deprivation of the use of money or its equivalent and that unless interest be added, the injured party cannot be fully compensated for the loss suffered. *New York, etc. v. Roper, supra; Grobe v. Kramer* (1942), 178 Misc. 247, 33 N.Y.S.2d 901. Interest is recoverable not as interest but as additional damages to accomplish full compensation. *Ind. Tel. Co. [Corp.] v. IBTC, Inc., supra.*

In some jurisdictions, the allowance of interest is a matter of legal right; in others it is a matter within the sound discretion of the trier of fact.

Although Indiana decisions appear in general agreement as to the prerequisites to recovering such damages, they disclose some confusion on whether the award, once the prerequisites are established, should be of right or discretionary with the fact finder.

The early cases of *Wabash Railroad Co. v. Williamson* (1891), 3 Ind.App. 190, 29 N.E. 455 and *Chicago, St. L. & P. R. R. Co. v. Barnes* (1891), 2 Ind.App. 213, 28 N.E. 328 took the view that their award was discretionary.

Then in *New York, C & St. L. Ry. Co. v. Roper* (1911), 176 Ind. 497, 96 N.E. 468, our Supreme Court considered the propriety of such awards. The court pointed out that the principle involved was not the award of interest as such, but was the rule of full compensation utilizing the statutory interest rate as a measure for the value of lost use of the property. The court then considered discretionary application and stated,

> The law dispenses no favors, and jurors should mete out equal and exact justice, and should not have the right to allow or refuse interest as one of the elements of just compensation. But in fixing the amount of damages in cases of this character they should be instructed.

\* \* \* \* \* \*

We find such problems to be quite distinct, however, from the notion that when all the necessary elements are present and undisputed, the award of damages for loss of use is a discretionary matter. In this regard we think *Roper* correctly state the rule, and it follows that upon the facts before us the court erred in not awarding damages for the lost use of the automobile and payroll checks from the time of their conversion. *Indianapolis Machinery Co., Inc. v. Cohen* (1978), Ind.App. [177 Ind. App. 208] 378 N.E.2d 931.

*Id. at 1311–12.*

12. The loss of property by Dr. Walters as a direct and proximate consequence of the Debtor William's wrongful acts of conversion are pecuniary damages that are complete and ascertainable as evidenced by the note of April 7, 1986, and thus Dr. Walters shall be awarded 8% prejudgment interest thereon, even though the note had no stated rate of interest thereon.

The final issue is the date of accrual of the prejudgment interest pursuant to I.C. 24–4.6–1–103. The April 7, 1986 note had no due date. A note is payable on demand in which no time for payment is stated. I.C. 26–1–3–108. It was not proven by Dr. Walters whether he made a demand on the Debtor William to pay him either on the note, or based on his underlying claim for conversion prior to the filing of his complaint in Adversary Proceeding No. 90–6030, or if such a remand was made, when it was made. In this situation, when no evidence of the date of demand is made prejudgment interest would normally accrue at the rate of eight percent per annum on the principal sum of $300,000.00 from the date of Dr. Walter's Adversary Complaint which was filed under Adversary Proceeding No. 90–6030 on March 5, 1990. *See, Continental Casualty Co. v. Novy*, 437 N.E.2d 1338 (Ind. App.1982). However, prejudgment interest on a conversion claim, accrues from the date of conversion. *THO Venture v. S.W., Inc.*, 444 N.E.2d 335, 340 (Ind.App.1983). It is clear that the Acts of Conversion by the Debtor occurred no later than July 7, 1986, and thus, prejudgment interest at the rate of 8% per annum shall accrue from that date.

The per diem rate on the accrued interest is $65.75.

Accordingly, based upon the foregoing Findings of Fact and Conclusions of Law, the Court will grant the § 505 Motion filed by the United States in the Main Case No. 89–62082. In addition, judgment shall be entered in Adversary Proceeding No. 91–6073, *United States of America v. William G. Walters and Terry G. Walters* revoking the Debtors General Discharge pursuant to § 727(d). Finally, a judgment shall be entered in Adversary Proceeding No. 90–6030, *William H. Walters v. William G. Walters,* determining that the indebtedness of the Debtor William to Dr. William H. Walters is nondischargeable pursuant to § 523(a)(6) in the principal sum of $300,000, plus 8% prejudgment interest from July 7, 1986, to judgment.

It is therefore,

**ORDERED, ADJUDGED, AND DECREED,** that the § 505 Motion of the United States filed in Main Case No. 89–62082 should be and is hereby GRANTED. The United States is hereby granted 30 days from the date of the entry of this Order to file and serve a recomputation of the tax, penalties, and interest in the 1984, 1985, and 1986 deficiency notices. The Debtors shall have 30 days from the service of the United States' recomputation to file any objections thereto, explaining precisely in detail what they contend is incorrect and why. This Court hereby retains jurisdiction to determine the correctness of any such recomputations.

The Clerk shall enter this order on a separate document pursuant to Fed.R.Bk.P. 9021, and show the entry of this order on the Main Case Docket No. 89–62082. And it is further,

**ORDERED, ADJUDGED, AND DECREED,** that the General Discharge granted to the Debtor William G. Walters and the Debtor Terry G. Walters in Main Case No. 89–62082 is hereby revoked pursuant to § 727(d) based upon the Complaint filed by the United States in Adversary Proceeding No. 91–6073.

The Clerk shall enter this Judgment on a separate document pursuant to Fed.R.Bk.P. 9021, place a copy in the jacket of Adversary Proceeding No. 91–6073, and show entry thereof on the Docket Sheet for Adversary Proceeding No. 91–6073, and on the Docket Sheet in the Main Case No. 89–62082. In addition, pursuant to Fed.R.Bk.P. 4006, Notice of this Judgment revoking discharge shall be given to all creditors in a manner provided by Fed.R.Bk.P. 2002. And it is further,

**ORDERED, ADJUDGED, AND DE-CREED,** that Judgment should be and is hereby granted to Dr. William H. Walters in Adversary Proceeding No. 90–6030, *William H. Walters v. William G. Walters,* and that the indebtedness of the Debtor William G. Walters to William H. Walters is hereby adjudged to be nondischargeable in the principal sum of $300,000, plus 8% pre-judgment interest from July 7, 1986, to the date of this judgment, or a per diem of $65.75, plus costs. Post-judgment interest shall accrue according to 28 U.S.C. § 1961(a).[20]

The Clerk shall enter this Judgment on a separate document pursuant to Fed.R.Bk.P. 9021, place a copy thereof in the jacket of Adversary Proceeding No. 90–6030, and show the entry thereof on the Docket Sheet.

## APPENDIX "A"

*List of Exhibits Admitted Into Evidence*

A Jack Carl Associates, commodity account trading records.

B–1 Subpoena production from Kemper Securities (successor to Blunt, Ellis & Loewi), including cover letter, account application, and securities.

B–2 Blunt, Ellis & Loewi response to IRS summons, including cover letter, account application, statement, and check.

B–3 Blunt, Ellis & Loewi account application. Better copy of part of B–2.

B–3a Blunt, Ellis & Loewi account application of 1982 again, plus account statement showing sale of Inland Steel Stock

B–4 Account Card from Blunt, Ellis & Loewi broker, Daniel Roszkowski.

D Citibank's production of payment order from Swiss Bank Corp.

E Documents related to $5,700 deposit at First Federal Savings & Loan of La-Porte.

H Part of 1987 Lakeshore Bank production—account statements, deposited items, and checks from 12/15/83 through 2/14/84.

I–1, –2, –3, and –5 (I–4 and I–6 not offered): 1992 Lakeshore Bank production (n/k/a First of America Bank)—documents reflecting certain deposits and withdrawals, including statements, deposited items, checks, cashier's checks, charge slips, credit slips.

J Certain 1990–92 account records from First Federal Savings Bank. (Joint account with John Roszkowski.)

K–1 Lind–Waldock & Co. commodity account statements: 11/30/83 9/28/84 Acct No. 91DAA 79459.

K–2 Lind–Waldock & Co. commodity account statements: 11/30/83 9/30–86 Acct No. 91DAA 68436.

K–3 Lind–Waldock account opening papers.

K–4 Lind–Waldock checks.

K–5 Lind–Waldock transfer statements.

L Michigan City Catholic Federal Credit Union (MCCU) subpoena production, including cover letter, Journal and Cash Voucher (with negotiated items) and wire transfer instruction records.

(All exhibits beginning with letters N through P were produced by Debtor William G. Walters in the box he turned over to the Trustee in response to the order compelling discovery, after his Rule 2004 examination.)

**20.** To the extent that the Debtors' Discharge has been revoked pursuant to § 727(d), based upon the judgment entered in Adversary Proceeding No. 91–6073, the nondischargeability judgment entered in Adversary proceeding No. 90–6030, may be deemed surplusage; however, if the judgment in Adversary Proceeding No. 91–6073 is set aside or reversed for any reason, it is the intention of the Court, that the judgment in Adversary proceeding No. 90–6030 remain in full force and effect, and in any event establishes the amount of the indebtedness of the Debtor William to Dr. Walters.

N–1 Blunt Ellis & Loewi statement and related Lakeshore Bank deposit ticket.

N–3 Lind–Waldock 1/31/84 statement.

N–4 Documents showing wire transfer of $10,000 to Jack Carl account from MCCU on 10/27/86.

N–5 Miscellaneous Jack Carl statements (11/30/84, 12/31/86, and 3/9/87).

O–1 Miscellaneous Swiss Bank Corp. account records.

O–2 Miscellaneous Guardian Trust Co.-statements.

P–1 Check carbons, Keliter Corp. account at MCCFCU, 1985.

P–2 Check stubs, Keliter Corp. account at MCCFCU, 1985.

P–5 Check carbons, Keliter Corp. account at MCCFCU, 1986.

P–6 Check stubs, Keliter Corp. account at MCCFCU, 1986.

P–9 Check carbons, Keliter Corp. account at MCCFCU, 1987.

Q–3 1–page combination of check register page showing $24,856.37 deposit on 6/27/84 at Lakeshore Bank and $20,000 cashier's check of 7/2/84 to Heusen E. Handfield. [Produced by the Debtor William G. Walters at his deposition on July 14, 1992.]

(All exhibits beginning with R were produced by the Debtor William G. Walters on 5/2/91 (at 2004 examination) or 10/28/91.)

R–1 John Angelos, CPA, 1/24/85 Memo to Tax File. Shows advice to the Debtor William G. Walters on reporting as income receipts from, and not repaid to, Dr. Walters.

R–1a Letter of 3/14/85 to John Angelos, CPA, from the Debtor William G. Walters. Proves understanding of tax law and also proves that funds that were paid to Dr. Walters belonged to him (and thus belies 10/25/82 gift document).

R–2 Letter of 11/12/84 to Bill from Dad. Shows the Debtor William G. Walters received instructions from Dr. Walters regarding transfer of assets. (This was list by the Debtor William G. Walters as his Exh. 26.)

R–3 Swiss Bank Corp. debit advice, 3rd Dec., 1984, in the amount of $30,000.

R–4 Contract form dated Oct. 25, 1982.

S–1 Contract dated March 25, 1981, between William H. Walters and the Debtor William G. Walters respecting 104 Valentine Court.

S–7 False receipt for payment in "gold coins" for 104 Valentine Court.

T–1 Documentation of Guardian Gold Fund account redemption by the Debtor William Grant Walters, in the amount of $26,972.52, with Guardian Trust check to Roywest Trust Corp. (Cayman) Ltd. dated 10/31/84. (T–1 is part of Document 27 of the Debtor William G. Walters as originally filed with the Court on 8/3/92 but omitted from Exhibit 27 as supplied with debtor's PRETRIAL PAPERS.)

T–2 Documents supplied by Guardian Trust to IRS Special Agent, including wire transfer record, tele-trade account statement, sale confirmation, and letter dated 10/18/84 from the Debtor William G. Walters to Mr. Novorosky of Guardian Trust.

U–1 Trust Agreement, supplied by First Citizens Bank f/k/a Citizens Bank of Michigan City, Indiana, to IRS Special Agent.

U–2 Letter of 5/29/85 to Burt Ross from William H. Walters. Proves that the Debtor William G. Walters effected loans against the cash values of the life insurance policies.

U–3 Checks: Penn Mutual Ins. Co. ($6355.58); New York Life Ins. Co. ($8792.00, $9235.00, and $8721.00).

V–1 1982 Joint Form 1040A, the Debtors Terry G. & William G. Walters.

V–2 1983 Joint Form 1040, the Debtors William G. & Terry G. Walters, plus supplements associated therewith at IRS Service Center.

V–3 1984 Joint Form 1040, the Debtors William G. & Terry G. Walters.

V–4 1985 Individual Form 1040, the Debtor William G. Walters.

V–5 1986 Individual Form 1040, the Debtor William G. Walters.

V–6 1985 Individual Form 1040, the Debtor Terry G. Walters.

V–7 Front of 1986 Individual Form 1040, the Debtor Terry G. Walters. (Back of form misplaced.)

V–8 1987 Joint Form 1040, the Debtors William G. & Terry G. Walters.

V–9 1988 Joint Form 1040, the Debtors William G. & Terry G. Walters (taxpayer's retained copy).

V–11 Order of Dismissal for Lack of Jurisdiction, entered by the Tax Court on 10/21/92, in No. 18016–92.

V–12a Forms 4340 ("Certificate of Assessments and Payments") for (1) the joint income tax liabilities of the Debtors William G. & Theresa G. Walters for 1984, (2) the separate income tax liabilities of the Debtor William G. Walters for 1985, and (3) the separate income tax liabilities of the Debtor William G. Walters for 1986.

V–13 Revenue Agent's Report (with privileged deliberative material deleted). To show computation of income by IRS.

W–2 Memorandum of Interview, 6/26/89, with the Debtor William G. Walters by IRS Special Agent, plus attached documents supplied by the Debtor William G. Walters, and constituting evidence admissible under F.R.E. 803(6) and 803(8).

X–1 Purchase Receipt from Coin Investors Coin Shop, Inc., dated 5/30/86, total $2,850, and constituting evidence admissible under F.R.E. 803(6).

X–3 Title information on 1985 Chrysler titled to Keliter Corp., from Indiana Bureau of Motor Vehicles, and constituting evidence admissible under F.R.E. 803(6) and 803(8).

X–4 Better copy of 10/22/86 check for $19,-000 from Nunemaker's Coin Shop to the Debtor William Walters. To trace funds.

X–5 Letter of 2/6/86 to the Debtor William Walters from David Hall.

X–6 Response to IRS Summons from American Express Centurion Bank, including account statements and two checks. V–1 3/8/83 agreement to trade on Dr. Walters' commodities account.

Y–3 Confirmation of revocation of Power of Attorney, including letter dated Dec. 4, 1985 (but actually written sometime later) from Dr. Walters to Atley Price, and 12/4/85 letter from Atley Price "To Whom It May Concern."

Y–5 4/7/86 promise by the Debtor William G. Walters to repay Dr. Walters for items taken.

Y–6 Two Letters to the Editor, Michigan City News Dispatch, by the Debtor William G. Walters.

Z–1 Excerpts from Statement of the Debtor William Grant Walters, taken 3/24/87, by Republic Insurance (pages 1–5, 9–11, 18, 22, 2729, 36–40, 42, 48, 70, 77–83, 111–13, 118–19, 125–26, 13031, and 134).

Z–3 Answers to Interrogatories, given by the Debtor William G. Walters in No. 90–6030. To demonstrate perjury.

Z–4 Sworn Proof of Loss, dated 3/27/86, by the Debtor Terry G. Walters to Illinois Farmers Ins. Co.

Z–5 United States' Second Request for Production, and Defendants' response thereto, in *United States v. William G. Walters, et ux.*, Civil No. S86–458 (N.D.Ind.). To show concealment of transactions.

aA–1 (Handwritten) List of coins delivered to Donald Clark, 12/4/85.

aA–2 (Typed) Inventory of Coins Obtained From Donald Clark on 1/20/86.

aA–3 (Typed) List of Gold, Silver and Numismatic Coins.

aD Letter dated 2/1/94 to James Byron, the Debtors William G. Walters, and Terry G. Walters confirming telephonic notice of time of day of trial commencement.

aE Schedule of Assets and Liabilities and Statement of Financial Affairs of Debtors, filed 12/26/89.

aF Dr. Walters amendment to his will, dated 9/ @ 82.

aG Exhibit 32 as listed in the Debtor William G. Walters' initial PRETRIAL PAPERS, filed 9/10/93, described therein as "Letter 2–4–86 to prove I openly filed forms for securities which I could have cashed anywhere without filing forms."

aH Exhibits 4 and 6 listed in the Debtor William G. Walters' initial PRETRIAL PAPERS, filed 9/10/93, described therein as "4. Letter Dated 11-6-85 to prove Swiss bank account" and "6. Letter dated 12-9-95 to prove Swiss bank account."

aI Residential Listing Agreement, dated 2/5/93.

aJ Excerpt of transcript of hearing held on April 9, 1994.

aK Purchase Agreement dated 9/7/93.

aL Settlement Statement dated 10/15/93.

aM Uniform Residential Loan Application dated 10/29/93.

aN Trial Deposition of Michael Abbell, taken 7/31/92 in these proceedings, and exhibits thereto.

aO Deposition of the Debtor William G. Walters, taken 3/9/87, in District Court action (*United States v. William G. Walters, et ux.*, No. S86-458).

aP Deposition of the Debtor Terry G. Walters, taken 3/9/87, in District Court action (*United States v. William G. Walters, et ux.*, No. § 86-458).

aQ Rule 2004 Examination of the Debtor William G. Walters, taken 5/2/91, in this case.

aR Rule 2004 Examination of the Debtor Terry G. Walters, taken 5/2/91, in this case.

aT 5/29/93 letter from the Debtor William G. Walters to Chief of Police, Michigan City, enclosing fabricated federal land patent with respect to 104 Valentine property.

aU Deposition of the Debtor William G. Walters taken 7/14/92 in these proceedings.

dC Excerpts from Deposition of Daniel Roszkowski taken in these actions on July 14, 1992, as follows:

(1) Cover appearances, index, and oath (for background and clarification of record in connection with introduction of following excerpt); and

(2) Page 10 line 13 through page 13 line 24, and Exhibit 1 referred to thereat [same as Government trial Exhibit B-4] (to show that Mr. Roszkowski, at the time of the deposition, thought that his brother-in-

law's name was the Debtor William H. Walters and that he had previously transacted business on behalf of his sister's husband, not his sister's father-in-law, and to add some context to the basis for that state of mind). This is admissible under F.R.E. 803(3).

ADDITIONAL EXHIBITS OFFERED BY COUNSEL FOR DR. WALTERS:

1 Deposition of the Debtor William G. Walters, taken 4/24/91.

● [reserved ruling on admissibility] Deposition of Richard Thompson.

● 1983 Bankruptcy Petition and associated materials.